845 P.2d 1238

**KEWANEE INDUSTRIES, INC., and The Pittsburg & Midway Coal Mining Co., Plaintiffs–Appellants,**

v.

**Gail REESE, Secretary of the Taxation and Revenue Department, State of New Mexico, Defendant–Appellee.**

**KEWANEE INDUSTRIES, INC., Plaintiff–Appellant,**

v.

**STATE of New Mexico, ex rel., TAXATION AND REVENUE DEPARTMENT, Defendant–Appellee.**

Nos. 20591, 20732.

Supreme Court of New Mexico.

Jan. 13, 1993.

Campbell, Carr, Berge & Sheridan, Michael Campbell, Bradford C. Berg, Santa Fe, for plaintiffs-appellants.

Tom Udall, Atty. Gen., Carolyn Wolf, Sp. Asst. Atty. Gen., Santa Fe, for defendant-appellee.

## OPINION

FRANCHINI, Justice.

This case involves two separate appeals: Case No. 20,732 by Kewanee Industries, Inc. (Kewanee), and Case No. 20,591 by Kewanee and Pittsburgh & Midway Coal Mining Co. (P & M).[1] At issue is the assessment of corporate and gross receipts

---

1. Both appeals were transferred to this Court from the Court of Appeals pursuant to NMSA 1978, Section 34–5–10 (Repl.Pamp.1990).

taxes on rental income from the leases of two draglines. In Case No. 20,732, the dispositive issue is whether the rental income is treated as business or nonbusiness income. In Case No. 20,591, the issue is whether the rental income is exempted from the gross receipts tax because the transactions were "isolated or occasional" and thus outside the scope of the taxpayer's regular business. Because both cases involve the tax treatment of the same transactions, we consolidated the cases pursuant to SCRA 1986, 12–202(F)(2).

The Tax Administration Act, NMSA 1978, §§ 7–1–1 to –82 (Repl.Pamp.1990 & Cum.Supp.1992) (Act), defines the procedure by which a taxpayer can call into question his or her liability for any tax. The Act requires that a taxpayer elect to dispute his liability for the payment of taxes either by protesting the assessment without making payment or by claiming a refund after making payment. Section 7–1–23.

In Case No. 20,732, Kewanee protested without payment and was, therefore, entitled to an administrative hearing. Section 7–1–24. Pursuant to Section 7–1–25, Kewanee appeals the adverse decision from that hearing before the Taxation and Revenue Department (Department). In Case No. 20,591, P & M paid the assessed gross receipts tax and filed a civil action for a refund in the Santa Fe County district court. Section 7–1–26. The district court entered judgment in favor of the Secretary of the Department, and pursuant to Section 7–1–26(A)(2), Kewanee and P & M appeal. We affirm on both appeals except on the issue of a penalty assessment in the first case.

## I.

Kewanee is incorporated in Delaware. Kewanee and P & M were both wholly-

owned subsidiaries of Gulf Oil Corporation during the assessment period.[2] Kewanee is an oil and gas company whose stock was acquired by Gulf in 1977. P & M is a coal company whose stock had been owned by Gulf for many years. On September 1, 1978, P & M sold to Kewanee a dragline for approximately $14,000,000. Kewanee leased the dragline back to P & M for a term of twenty years. On February 15, 1979, P & M sold to Kewanee a second dragline for approximately $14,000,000. This dragline was also leased back to P & M for a term of twenty years.[3] A dragline is a large piece of equipment used in the surface mining of hard minerals.

Gulf, Kewanee, and P & M filed separate federal income tax returns in 1978. In that year, Kewanee had federal taxable income. P & M had zero federal taxable income. The sale-leaseback of the draglines directed by their common owner was intended to transfer federal depreciation and investment tax credits from P & M to Kewanee. Kewanee received rentals from P & M in the amount of $837,500 for each dragline for each year until the two leases were sold to Chrysler Financial Corporation after the 1986 payments. The total amount of rentals received by Kewanee was approximately $10,900,000.

## II.

◼ In Case No. 20,732, Kewanee raises five points on appeal. The first four points concern the classification of the rental income from the draglines, and the fifth point questions whether a tax penalty was appropriate. Under Section 7–1–25(C), we may set aside the hearing officer's decision only if it was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, or not in accordance with the law. We do not reweigh the evidence,

**2.** Both Kewanee and P & M are now wholly-owned subsidiaries of Chevron Corporation.

**3.** Kewanee purchased the draglines by setting up an intercompany payable to Gulf. Kewanee then reclassified the dragline as a capital lease

for financial purposes. The rent payments were applied to reduce the payable owed by Kewanee to Gulf and to reduce the receivable from P & M. For income tax purposes, Kewanee accounted for the transaction as a true lease.

but instead review the decision in the light most favorable to the hearing officer's decision. *C & D Trailer Sales v. Taxation & Revenue Dep't,* 93 N.M. 697, 700, 604 P.2d 835, 838 (Ct.App.1979). If more than one inference can be drawn from the evidence then the inference drawn by the hearing officer is conclusive. *Waldroop v. O'Cheskey,* 85 N.M. 736, 738, 516 P.2d 1119, 1121 (Ct.App.1973).

In 1981 and 1983, the two tax years subject to protest, Kewanee filed its corporate income tax return in New Mexico on a separate corporate entity basis. Kewanee reported no nonbusiness income in those returns. It included the rent payments in its apportionable business income, but did not include these payments in its New Mexico sales factor, nor did it include the cost of the draglines in its New Mexico property factor. The Department issued an assessment in the amount of $298,500 in corporate income tax, a penalty in the amount of $29,850, and interest in the amount of $138,771.75 for those tax years. Interest continues to accrue at $3,731.25 per month.

The dispositive issue is whether Kewanee's net income from the rental of the two draglines is classified as business or nonbusiness income. These terms are defined in the Uniform Division of Income for Tax Purposes Act, NMSA 1978, §§ 7–4–1 to 4–21 (Repl.Pamp.1990) (UDI).[4] Section 7–4–2 reads:

A. "business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations;

\*      \*      \*      \*      \*      \*

E. "nonbusiness income" means all income other than business income;
\*  \*  \*  \*

These statutory terms are further defined in the Department's Regulation UDI 2.2(1) (formerly I.T. 17(a)) which provides in part:

Income of any type or class and from any source is business income if it arises from transactions and activity occurring in the regular course of a trade or business. Accordingly, the critical element in determining whether income is "business income" or "nonbusiness income" is the identification of the transactions and activity which are the elements of a particular trade or business. In general, all transactions and activities of the taxpayer which are dependent upon or contribute to the operations of the taxpayer's economic enterprise as a whole constitute the taxpayer's trade or business and will be transactions and activity arising in the regular course of, and constitute integral parts of, a trade or business.

The first case to interpret Section 7–4–2, then Section 72–15A–17A, in New Mexico was *Champion International Corp. v. Bureau of Revenue,* 88 N.M. 411, 540 P.2d 1300 (Ct.App.1975). In *Champion,* a New York corporation was engaged in the manufacture and sale of a variety of wood products in all fifty states. The taxpayer argued that its income from interest on short-term investments, rents, and sales of logs for telephone poles was nonbusiness income and therefore should not be included in the apportionable base, but should be allocated to the state where the transactions occurred. The Court disagreed and found that the income in question was business income. Judge Sutin wrote the opin-

---

**4.** The UDI provides a uniform system among the states that have adopted it for allocating and apportioning the income of multistate corporations among the various states in which they do business. UDI divides multistate corporations' income into two groups: business and nonbusiness income. Business income is apportioned among the states according to a three-factor formula that takes into consideration a corpora-

tion's property, sales, and payroll in any given state in proportion to its total property, sales, and payroll to determine an apportionment factor. The factor is then applied to the corporation's income to apportion it to a given state in some reasonable proportion to the corporation's business activities within that state. Nonbusiness income is allocated to only one state taxing jurisdiction.

ion, and Judges Wood and Lopez specially concurred.

Judge Sutin defined "transactions and activity in the regular course of the taxpayer's trade or business" in Section 7–4–2(A) as "[b]usiness deals and the performance of a specific function in the normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business." *Champion*, 88 N.M. at 414, 540 P.2d at 1303. He concluded that this definition constituted a transactional test and a use test. If the transaction is one in which the enterprise normally engaged, the consequent income from the transaction is business income. Judge Sutin held that it was Champion's normal and customary practice to invest excess capital not immediately needed for business purposes. He also found it significant that the investment income was to be used by Champion in the future for business purposes. *Id.* at 415, 540 P.2d at 1304.

Judge Wood specially concurred, rejecting Champion's narrow view that limited the meaning of taxpayer's trade or business to its main or primary business. He stated:

> [The UDI] makes no reference to "main business" or "main course of business." As I read [the section], it makes no difference whether the income derives from the main business, the principal business, the occasional business or the subordinate business so long as the income arises from the "regular course" of business.

*Id.* at 417, 540 P.2d at 1306. Judge Lopez's approach was to look to whether the income in question was "independent" of a taxpayer's business, relying on the case law addressing the unitary business concept to determine if the income is sufficiently "independent" to be nonbusiness income.[5] *Id.* at 418, 540 P.2d at 1307.

In *McVean & Barlow, Inc. v. New Mexico Bureau of Revenue*, 88 N.M. 521, 543 P.2d 489 (Ct.App.), *cert. denied*, 89 N.M. 6, 546 P.2d 71 (1975), the Court of Appeals construed the same section and stated that the definition of business income: "can be broken down into two parts, each with distinct meanings; (1) ' * * * transactions and activity in the regular course of the taxpayer's trade or business * * * ' and (2) situations in which ' * * * the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations * * * * ' " *Id.* at 522–23, 543 P.2d at 490–91. Relying on the second part of the definition, the Court held that the taxpayer's gain from the liquidation of a portion of its pipe-laying business was nonbusiness income because the liquidation of a business was an unusual, one-time transaction

5.  Under both the Due Process and Commerce Clause of the Constitution, a state may not, when imposing an income-based tax, "tax value earned outside its borders." *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787 (1982). The "unitary business" concept was developed to meet the constitutional considerations of apportioning out of state multinational and multistate corporate income. In its most basic sense:

> A multistate business is a "unitary business" for income tax purposes when operations conducted in one state benefit and are in turn benefited [sic] by operations in another state. "If its various parts are interdependent and of mutual benefit so as to form one integral business rather than several business entities, it is unitary."

*Champion*, 88 N.M. at 413, 540 P.2d at 1312 (citations omitted). A multitude of opinions have been written by the United States Supreme Court on the unitary business principle. *See generally Allied–Signal, Inc. v. Director, Div. of Taxation*, —— U.S. ——, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) (interpreting the unitary business principle); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (same); *ASARCO; F.W. Woolworth Co. v. Taxation & Revenue Dep't of N.M.*, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982) (same); *Mobil Oil Corp. v. Commissioner of Taxes of Vt.*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980) (same); *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) (same).

Justice Brennan astutely noted in *Container Corp.* that "[t]wo aspects of the unitary business/formula apportionment method have traditionally attracted judicial attention. These are, as one might easily guess, the notions of 'unitary business' and 'formula apportionment,' respectively." 463 U.S. at 165, 103 S.Ct. at 2940.

that did not amount to an integral part of the taxpayer's regular trade or business. *Id.* at 524, 543 P.2d at 492.

In *Tipperary Corp. v. New Mexico Bureau of Revenue*, 93 N.M. 22, 595 P.2d 1212 (Ct.App.), *cert. denied*, 92 N.M. 675, 593 P.2d 1078 (1979), the gain on the sale of coal leases by a company primarily in the business of exploring, developing, and processing oil and gas was held to be business income. Relying on *Champion*, the Court of Appeals found it significant that the revenue derived from the lease sale was used by Tipperary for the general operating needs of its various business endeavors. *Id.* at 27, 595 P.2d at 1217.

Kewanee contends that its income from dragline rentals is nonbusiness income because it is an oil, gas, and chemical company without any history of leasing or financing assets of any kind, "much less coal draglines." Kewanee also argues that the draglines were not used or useable by the company in its oil, gas, or chemical operations and that the transactions did not constitute an element of any trade or business in which Kewanee engaged. Kewanee reasoned that "[t]he two transactions were actually just a passive investment by Kewanee." We disagree. Based upon our reading of the record and applying the above interpretations of business income, we hold that the rental income from the draglines in this case is business income as defined in Section 7–4–2(A).

We first look at the purpose of the transaction and at Kewanee's use of income. The purpose of the sale-leaseback transaction was to generate substantial tax savings, freeing capital for other purposes. Kewanee purchased the dragline with money borrowed from its parent Gulf, and all rents, from an accounting viewpoint, were used to repay the loans. The entire transaction was done at the direction of Gulf and for the tax benefits accruing to Gulf, Kewanee, and P & M. Thus, with its taxable income for federal tax purposes, Kewanee could take investment tax credits and depreciation deductions from the drag-lines. This effectively reduced Kewanee's federal income tax liability, freeing money for other uses by Kewanee.

Kewanee's enhanced earnings through tax savings were presumably used to further the remainder of its business. Kewanee never disputed the Department's assertion that such income was used for general purposes, nor did it present any evidence to the contrary. *See Champion*, 88 N.M. at 413, 540 P.2d at 1302 (holding that taxpayer has the burden of presenting evidence tending to dispute the factual correctness of the assessment).

Applying the transactional test, the evidence also supports the conclusion that the acquisition of tax benefits is normal, typical, and customary procedure of many business entities. Buying tax-reduction assets is standard business practice. *See generally Hoosier Energy Rural Elec. Coop. Inc. v. Indiana Dep't of State Revenue*, 528 N.E.2d 867 (Ind.Tax Ct.1988), *aff'd*, 572 N.E.2d 481 (Ind.), *cert. denied*, —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991) (examining tax consequences of selling accelerated cost recovery and investment tax credits).

· We view Kewanee's contention that leasing coal draglines was outside its business to be a static and unrealistic view of business. Although Kewanee had not "historically" engaged in the business of leasing draglines, clearly it had entered that business with a large investment and long-term commitment of resources. Corporations are constantly entering into new businesses. As Judge Wood noted in his concurring opinion in *Champion*, an activity can also be a taxpayer's trade or business even though the activity is occasional or subordinate so long as the income arises from the regular course of business. *Champion*, 88 N.M. at 417, 540 P.2d at 1306. Here, Kewanee received lease payments of $1,675,000 for the tax years at issue as well as for several other years.

We do not find *American Metal Climax, Inc. v. Commissioner of Taxation*, No.

1583, 1972 WL 125 (Minn.Tax Ct. Nov. 9, 1972) persuasive. A different standard was employed in that case, one that ignored the use test. Furthermore, the *American Metal Climax* court narrowly defined the taxpayer's business before posing the question of what constituted the taxpayer's business. More pertinent here is the case of *National Service Industries, Inc. v. Powers,* 98 N.C.App. 504, 391 S.E.2d 509 *appeal denied,* 327 N.C. 431, 395 S.E.2d 685 (1990), in which the taxpayer who was not in the business of generating electricity, received tax benefits on electrical generating equipment it purchased from and leased back to a power company. The court held that:

> The determinative question here is not whether plaintiff is in the business of generating electricity but whether the return on plaintiff's investment is an integral part of the plaintiff's trade or business. Here, the lease arrangement was a means of gaining working capital and increasing cash flow for all of plaintiff's business operations. This is certainly "integral part" of plaintiff's business.

*Id.* 391 S.E.2d at 512 (citing *Champion* ).

We hold there is substantial evidence to conclude that Kewanee's income from its dragline leases was business income because the leases generated substantial capital for Kewanee's general business purposes, and the leases were ongoing, recurring transactions constituting a regular or customary portion of Kewanee's overall business. These transactions contributed to Kewanee's economic enterprise as a whole, constituted transactions and activity arising in the regular course of its business, and constituted integral parts of Kewanee's trade or business.

■ The determination of the business or nonbusiness nature of the rental income also governs the disposition of the following two sub-issues: Whether the value of the draglines should be included in Kewanee's property factor; and whether Kewan-

ee's rental receipts should be included in its sales factor. Because we conclude that the income is business income, the draglines, as property that the taxpayer used in New Mexico, should be included in both the denominator and numerator of Kewanee's property factor. *See* Sections 7–4–11 and 7–4–13. Additionally, Kewanee's rental receipts should be included in both the denominator and the numerator of its sales factor. *See* UDI 16:1(D).

### III.

■ Under Section 7–1–69(A), a penalty may be added "due to negligence or disregard of rules and regulation * * * * " The Department relied on the definition of negligence in T.A. Regulation 69:3 and the indications of nonnegligence listed in T.A. Regulation 69:4(4) to impose a ten percent penalty under Section 7–1–69(A). The Department stated that: "[n]onnegligence is indicated where a taxpayer proves that his failure to pay tax was caused by reasonable reliance on the advice of competent tax counsel or accountant as the taxpayer's liability after full disclosure of all relevant facts." Thus, the Department imposed a penalty, partly because Kewanee did not present evidence that it consulted a tax expert.

We will not apply T.A. Regulations 69:3 and 69:4 to determine whether Kewanee was negligent. The regulations were promulgated in 1985 and were not in effect during the tax years at issue. A regulation promulgated by an administrative agency shall be construed to have retroactive effect only if it is clearly and manifestly intended. *Harder v. Kansas Comm'n on Civil Rights,* 225 Kan. 556, 592 P.2d 456, 459 (1979); *cf. Psomas v. Psomas,* 99 N.M. 606, 609, 661 P.2d 884, 887 (1982) (operation of statute is prospective unless retroactive effect clearly intended by legislature).

■ The interpretation of Section 7–1–69(A) in effect when the returns were filed is stated in *Tiffany Construction Co. v. Bureau of Revenue,* 90 N.M. 16, 558 P.2d

1155 (Ct.App.1976), *cert. denied,* 90 N.M. 255, 561 P.2d 1348 (1977). In Tiffany, the Court of Appeals declared that "[e]very person is charged with the reasonable duty to ascertain the possible tax consequences of his action. This can be done by consultation with one's legal advisor. Depending on the facts, failure to do so may constitute negligence." *Id.* at 17, 558 P.2d at 1156. Under this standard, negligence is a case by case factual determination, and consultation with legal tax counsel is not an absolute requirement.

■ There was legal authority, *American Metal Climax,* to support Kewanee's position at the time the returns were filed. Thus, "reasonable doubt as to the interpretation and applicability of the various taxes sought to be imposed by the order of the [department]" is not negligence. *Co-Con, Inc. v. Bureau of Revenue,* 87 N.M. 118, 124, 529 P.2d 1239, 1245 (Ct.App.), *cert. denied,* 87 N.M. 111, 529 P.2d 1232 (1974).

■ Finally, the Department notes that inconsistently including the draglines in apportionable business and omitting them in the numerators of the sales and property factors constitute negligence on Kewanee's part. Kewanee claims its tax department made an honest clerical error because the inconsistency in how the revenues from the leases were reported is so obvious. We agree with Kewanee that the inconsistent income base is not grounds for imposing a penalty when the actual audit adjustment was limited to reversing a reasonable factor treatment that was not negligent.

## IV.

■ Case No. 20,591 involves the assessment of gross receipts taxes for the leases of the draglines from December 1, 1980 through December 31, 1986. The Department denied Kewanee's claim for a refund in the amount of $755,091.91. Kewanee filed suit in Santa Fe County district court seeking refund of the gross receipts tax pursuant to Section 7–1–26(A)(2). The dis-

trict court granted the Secretary of the Department's motion for summary judgment. We affirm.

The New Mexico Gross Receipts and Compensating Tax Act, NMSA 1978, §§ 7–9–1 to 82 (Repl.Pamp.1990 & Cum.Supp. 1992), imposes a tax on the gross receipts of any person engaging in business in New Mexico. Section 7–9–4(A). "[E]ngaging in business" is defined as "carrying on or causing to be carried on any activity with the purpose of direct or indirect benefit." Section 7–9–3(E). There is a presumption that receipts of a person engaging in business are subject to the gross receipts tax. NMSA 1978, § 7–9–5 (Repl.Pamp.1990). For Kewanee to prevail, it must clearly overcome this presumption. *See Archuleta v. O'Cheskey,* 84 N.M. 428, 431, 504 P.2d 638, 641 (Ct.App.1972). Additionally, where an exemption is claimed, the statute is construed strictly in favor of the taxing authority. *Stohr v. New Mexico Bureau of Revenue,* 90 N.M. 43, 46, 559 P.2d 420, 423 (Ct.App.1976). The exemption "must be clearly and unambiguously expressed in the statute, and must be clearly established by the taxpayer claiming the right thereto." *Chavez v. Commissioner of Revenue,* 82 N.M. 97, 99, 476 P.2d 67, 69 (Ct.App. 1970). "Thus, taxation is the rule and the claimant must show that his demand is within the letter as well as the spirit of the law." *Security Escrow Corp. v. State ex rel. Taxation & Revenue Dep't,* 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App.1988).

The sole issue raised by Kewanee is whether its receipts from leasing the two draglines are exempt from gross receipts tax pursuant to Section 7–9–28. This provision provides:

Exempted from the gross receipts tax are the receipts from the isolated or occasional sale of or leasing of property or a service by a person who is neither regularly engaged nor holding himself out as engaged in the business of selling or leasing the same or similar property or service.

■ By its terms, Section 7–9–28 contemplates two requirements: 1) that the

transaction be isolated or occasional, and 2) that the seller-lessor is not engaged or holding himself out as engaged in the business of selling or leasing the same or similar property. These two requirements are interrelated, and proof of one could be proof of the other. Thus, if the seller-lessor is engaged in the business of selling or leasing the type of equipment proposed to be sold, the isolated or occasional sale exemption is not available. *Besser Co. v. Bureau of Revenue*, 74 N.M. 377, 383, 394 P.2d 141, 146 (1964).

Additionally, G.R. Regulation 28:1, promulgated under the isolated or occasional sale component of Section 7–9–29, sets forth several nonexclusive criteria to be considered in determining the availability of the exemption. The Department relies on the following four criteria to support its argument:

A. the nature of the service or property;

B. the nature of the market for the service or property sold or leased;

C. the number of sales or leases made within a given period;

     \*     \*     \*     \*     \*     \*

E. the duration of the sales or leasing activity.

Although lacking in analysis, the gross receipts tax regulations along with the examples in G.R. Regulation 28:2 do give some indication of the types and level of selling or leasing activity sufficient to constitute "engaging in business." In determining if Kewanee's leasing was on a regular and continuous basis or if it was "isolated or occasional," we look to the definition of isolated and occasional.

In *Besser*, we defined " 'isolated' as 'unique; occurring alone or once; sporadic, not likely to recur,' " and we defined " 'occasional' as 'met with, appearing or occurring irregularly and according to no fixed or certain scheme.' " *Besser*, 74 N.M. at 383, 394 P.2d at 146 (quoting Webster's New International Dictionary (3rd Ed.

1971)). In *Besser*, we did not focus on the number of transactions, but instead on the taxpayer's line of business. The taxpayer in *Besser* was in the business of leasing and therefore "was doing exactly what it was organized and authorized to do \* \* \* \* " *Id.*

Kewanee argues that the transactions were outside of its line of business because its leases were unique and the transactions were not typical of its regular oil and gas business. Once again we disagree with Kewanee's static view of business.

Our first disagreement with Kewanee is that the two leases clearly were not "isolated" events. Although Kewanee had not "historically" engaged in the business of leasing draglines, it clearly entered that business with a large investment and a long-term commitment of resources. Second, the leases had twenty-year terms, which resulted in a fixed amount of income over a long period of time. The income derived from the two transactions amounted to approximately one-third of the total income that Kewanee reported. In addition, Kewanee's leases supplied nearly one-fifth of all the draglines in New Mexico. Thus, the leases clearly were not "occasional." Finally, purchasing equipment unrelated to Kewanee's ordinary oil and gas business with the obvious purpose of leasing it back for profit demonstrates that Kewanee planned to make a business of leasing draglines, a business that provided substantial annual income. Therefore, proceeds from that business were subject to gross receipts tax.

Based on the foregoing, in Case No. 20,-732 we affirm the decision and order of the Department's hearing officer except for the assessment of a penalty. On that issue, we reverse and remand for an entry consistent with this opinion. In Case No. 20,591, the judgment of the trial court is affirmed.

IT IS SO ORDERED.

BACA and FROST, JJ., concur.