2003-NMSC-007

64 P.3d 474

**TPL, INC., Protestant–Petitioner,**

v.

**NEW MEXICO TAXATION & REVENUE DEPARTMENT, Respondent–Respondent.**

No. 26,505.

Supreme Court of New Mexico.

Dec. 19, 2002.

Keleher & McLeod, P.A., Tracy J. Ahr, Claudia Gayheart Crawford, Thomas C. Bird, Albuquerque, for Petitioner.

Patricia Madrid, Attorney General, Bruce J. Fort, Special Assistant Attorney General, Santa Fe, for Respondent.

## OPINION

MAES, Justice.

{1}   NMSA 1978, § 7-9-57 (1989, prior to 1998 & 2000 amendments) provides New

Mexico businesses with a deduction from the gross receipts tax for services provided to out-of-state buyers. Businesses are not eligible for the deduction, however, if the out-of-state buyer either makes initial use or takes delivery of the "product of the service" in New Mexico. *Id.* Taxpayer TPL, Inc. entered contracts with a division of the United States Army to demilitarize and dispose of unwanted weapons. TPL claimed it could deduct its receipts from these contracts because it was providing services to an out-of-state buyer. The New Mexico Taxation and Revenue Department (hereinafter "Department") denied the deduction on the basis that the buyer made initial use or took delivery of the product of service in New Mexico. The Court of Appeals affirmed. *TPL, Inc. v. N.M. Taxation & Revenue Dep't,* 2000–NMCA–083, ¶ 14, 129 N.M. 539, 10 P.3d 863. We granted certiorari. Because TPL met its burden to establish that it provided services to an out-of-state buyer that neither made initial use nor took delivery of its product of service in New Mexico, we reverse.

**BACKGROUND**

{2} TPL, a New Mexico corporation with offices in Albuquerque, is one of the leading companies in the field of "demilitarization" of surplus munitions. It renders live weapons, termed "energetics," unusable so they are safe for disposal. It has developed methods of recovering components of munitions, purifying recovered materials, synthesizing new materials from the recovered components, and identifying commercial markets for the products. TPL's goal is to have "zero waste stream." In other words, it seeks to sell, reuse, or recycle all residual materials after the energetics have been demilitarized. If, however, it cannot identify a commercial market for the recovered components, it disposes of the residual materials.

{3} This appeal concerns TPL's contracts with a division of the United States Army, Industrial Operations Command ("IOC"), located in Rock Island, Illinois. In its winning bid to IOC, TPL proposed that it would demilitarize various types of energetics at Fort Wingate, a decommissioned military base in McKinley County, New Mexico, then process the residual materials. IOC obtained permission to perform its contracts at Fort Wingate. While the contract was in effect, IOC shipped hundreds of tons of munitions to Fort Wingate for demilitarization. At some later point, IOC transferred title to the munitions to TPL so that TPL could then sell, recycle, or dispose of the residual materials. TPL kept the proceeds from the sale of recovered materials.

{4} In June 1997, the Department audited TPL for the tax period beginning January 1992 and ending April 1997. As a result of the audit, the Department disallowed TPL's deduction of its gross receipts from its contracts with IOC. It also disallowed TPL's deduction for two contracts with the Naval Surface Warfare Center, which called for TPL to design a pilot plant that would reprocess surplus energetics, and deductions for certain other transactions. In December 1997, the Department assessed TPL's outstanding tax liability to be $304,964.98, representing $215,507.22 in gross receipts taxes, $6962.30 for compensating taxes, a $22,246.98 penalty, and $60,248.48 in interest. In March 1998, TPL paid $11,773.43 of the assessment and filed a timely formal protest of the remaining amount of the assessment. At a hearing in December 1998, the Department abated the gross receipts tax, penalty, and interest assessed on the receipts of four sales, upon proof that TPL had paid those taxes. TPL continued to dispute the Department's assessment of $293,191.55, representing gross receipts taxes from the contracts with IOC and the Naval Surface Warfare Center, plus penalty and interest.

{5} Before the hearing officer, the Department argued that TPL was not entitled to the deduction because the buyer, IOC, made initial use of or took delivery of "the product" of TPL's service in New Mexico. It argued that the product of service was the "rendering safe, and perhaps recyclable, ordnance that otherwise was dangerous." It further argued "[t]hat deconstruction and rendering safe was delivered here and initially used here." In support of this argument, the Department explained that initial use does not require the actual physical presence of the buyer. In addition, the Department argued that the buyer was the federal gov-

450

ernment, not IOC specifically, and that the federal government and all of its military agencies are present in New Mexico. TPL, on the other hand, argued that its services are "productless" because they are "deconstructive" in nature—there is nothing left over at the end of the process to use or deliver. It further argued that, even if there was a product of service, IOC neither made initial use of or took delivery of the product of service in New Mexico, because it had no office, employees, or agents in New Mexico.

{6} The hearing officer ruled that the gross receipts from the contracts with the Naval Surface Warfare Center were properly deducted but denied the deductions of receipts from three demilitarization contracts with IOC. She rejected TPL's argument that IOC had no presence in New Mexico, concluding that the presence of IOC munitions, once shipped to Fort Wingate, constituted IOC presence in New Mexico. She also concluded that IOC was present in New Mexico because it "had sufficient authority over the Army's facilities at Fort Wingate, New Mexico, to negotiate an agreement with TPL for use of those facilities." The hearing officer also rejected the argument that TPL's service was "productless." The hearing officer concluded that the "product of TPL's demilitarization services was the transformation of formerly dangerous munitions into components and materials suitable to be recycled and reused for other purposes." She further concluded that "IOC took delivery of this product in New Mexico by virtue of the fact that TPL's services were performed on IOC property that was physically located in New Mexico and remained in New Mexico after completion of the services." In addition, she concluded that "IOC made initial use of the deconstructed materials and components when it transferred title and risk of loss to TPL as consideration for TPL's reduction of the bid price on its demilitarization services. This transfer took place in New Mexico." Based on these conclusions, she affirmed the Department's denial of TPL's deduction.

{7} TPL appealed the hearing officer's decision regarding the IOC contracts to the Court of Appeals. At stake was $218,826.37, representing the gross receipts taxes for the three IOC contracts, plus penalties and interest. In its appeal, TPL complained that the hearing officer based her decision on theories that she crafted, rather than those presented by the Department, and that she drew improper inferences from the factual record. TPL specifically disputed whether IOC had control over the Fort Wingate facility, and complained that, because the Department did not raise this theory, it had no opportunity to present evidence on this issue. It also disputed the hearing officer's conclusion that the transfer of title to TPL represented consideration for a reduction in bid price. TPL noted that its bid price was reduced for only one of the three contracts in question. It also raised several constitutional arguments.

{8} The Court of Appeals defined the product of TPL's services as both "neutralized materials" and "the ability to dispose of the inert munitions in an environmentally responsible way." *TPL*, 2000–NMCA–083, ¶ 14, 129 N.M. 539, 10 P.3d 863. It then concluded that IOC "made initial use or took delivery of the product generated by Taxpayer's services when it transferred title to the disposable materials to Taxpayer." *Id.* ¶ 17. Unlike the hearing officer, however, the Court of Appeals attached no relevance to the possibility that consideration was given for the transfer of title. Instead, it concluded that "[i]t is dispositive that Buyer transferred title to the munitions when they were capable of being disposed—and Taxpayer admits this—and that this happened in New Mexico." *Id.* at ¶ 15. It therefore did not address the hearing officer's conclusions regarding IOC's control over Fort Wingate. After the Court of Appeals denied its motion for rehearing, TPL filed a petition for writ of certiorari, which we granted.

DISCUSSION

{9} The central issue in this case is whether TPL is liable for gross receipts taxes on the payments received from IOC, or is eligible to deduct its receipts for those contracts pursuant to Section 7–9–57, which, during the relevant time period, provided that:

A. Receipts from performing a service may be deducted from gross receipts if the sale of the service is made to a buyer who

delivers to the seller either a nontaxable transaction certificate or other evidence acceptable to the secretary that the transaction does not contravene the conditions set out in Subsection C of this section:

. . .

C. Receipts from performance of a service shall not be subject to the deduction provided in this section if the buyer or any of the buyer's employees or agents:

(1) makes initial use of the product of the service in New Mexico; or

(2) takes delivery of the product of the service in New Mexico.[1]

There is a presumption that all persons engaging in business in New Mexico are subject to the gross receipts tax. NMSA 1978, § 7-9-5(A) (2002). "Thus, taxation is the rule and the claimant must show that his demand is within the letter as well as the spirit of the law." *Rauscher, Pierce, Refsnes, Inc. v. Taxation & Revenue Dep't,* 2002-NMSC-013, ¶ 11, 132 N.M. 226, 46 P.3d 687 (quoting *Kewanee Indus., Inc., v. Reese,* 114 N.M. 784, 791, 845 P.2d 1238, 1245 (1993) (citations omitted)). For that reason, deductions are construed strictly against the taxpayer. *Sec. Escrow Corp. v. State Taxation & Revenue Dep't,* 107 N.M. 540, 545, 760 P.2d 1306, 1311 (Ct.App.1988). The right to a deduction must be clearly and unambiguously expressed in the statute. *Id.* The taxpayer must show that it is clearly entitled to the statutory deduction. *Id.*

{10} Generally, there is a presumption that the Department's assessment is correct. *See* NMSA 1978, § 7-1-17(C) (1992). Nonetheless, we review de novo a lower court or administrative agency's application of law to facts. *Quantum,* 1998-NMCA-050, ¶ 8, 125 N.M. 49, 956 P.2d 848. In addition, when we are required to interpret the phrases within a statute, we are presented with a question of law, which we review de novo. *See Rauscher,* 2002-NMSC-013, ¶ 26, 132 N.M. 226, 46 P.3d 687; *see also Quantum Corp. v. Taxation & Revenue Dep't,* 1998-NMCA-050, ¶ 8, 125 N.M. 49, 956 P.2d 848. This is not a case where the hearing officer was asked to resolve con-

flicting evidence, and therefore was required to resolve any inferences in favor of the Department. *Cf. Archuleta v. O'Cheskey,* 84 N.M. 428, 430, 504 P.2d 638, 640 (Ct.App. 1972) (rejecting challenge to finding of fact regarding the appropriate markup on liquor sales). The essential facts—the facts regarding the nature of TPL's contracts with IOC— are undisputed. In cases where such facts are undisputed, " 'it is the function of the courts to interpret the law,' and courts are in no way bound by the agency's legal interpretation." *Chavez v. Mountain States Constructors,* 1996-NMSC-070, ¶ 20, 122 N.M. 579, 929 P.2d 971 (quoting *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n,* 120 N.M. 579, 583, 904 P.2d 28, 32 (1995)); *see also Chavez v. Commissioner of Revenue,* 82 N.M. 97, 476 P.2d 67 (Ct.App. 1970) (rejecting, on undisputed facts, Department's interpretation of statute taxing revenue from hotel rentals).

{11} TPL has raised three core arguments throughout the proceedings. First, it argues that its services are "productless" because there is nothing left when the services are complete, and therefore there was no "product of the service" to be used by or delivered to the buyer, IOC. Second, in the alternative, it argues that if there is a product of service, IOC did not make initial use of that product in New Mexico. Finally, it argues that IOC did not take delivery of the product of service in New Mexico. Thus, we are asked to construe three terms within the statute: (1) "product of service," (2) "initial use," and (3) "delivery." We do so in order to determine whether TPL established its right to the deduction, or whether the hearing officer correctly concluded that the exception applies.

*'Product of the Service'*

{12} TPL asserts that there was nothing left when its services were completed, and therefore it created no product of service for IOC to either use or receive. With no product of service, TPL argues, the deduction automatically applies so long as there is an out-of-state buyer because there can be no use or delivery when there is no

---

1. A 1998 amendment to the statute incorporated the language in Subsection C into Subsection A.

product of service. We reject the argument that there was no product of service in this case. Section 7–9–57 is structured so as to create a presumption that any service will have a product. We are invited by the language of the statute to search for the product of the service in this case. We agree with the Court of Appeals that the "product" is the "direct result" or "consequence" flowing from the service. *TPL*, 2000–NMCA–083, ¶ 13, 129 N.M. 539, 10 P.3d 863 (citations omitted). Our task, in identifying the "product of service," is to determine what benefit the buyer received—what the buyer paid for. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998–NMCA–078, ¶ 11, 125 N.M. 244, 959 P.2d 969. Such benefits can be tangible. An automobile mechanic for example, provides a tangible product of service. *See, e.g. Reed v. Jones*, 81 N.M. 481, 468 P.2d 882 (Ct.App.1970). Other services provide only intangible results. For example, there would be no tangible product of service resulting from a patient's visit to a psychiatrist. Yet, under this statute, we believe those services would result in a product that is both used by and delivered to the patient. In other cases, the distinction between tangible and intangible results might be less clear.

{13} The hearing officer concluded that the " 'product' of TPL's demilitarization services was the transformation of formerly dangerous munitions into components and materials suitable to be recycled and reused for other purposes." We agree with TPL that this language merely describes the service rendered, not the product of service. The hearing officer drew this distinction in discussing TPL's other contracts. For those contracts, TPL designed and constructed a prototype plant "to determine whether the manufacture of a precision blasting agent could be achieved on a commercial scale." The Department argued that the "product of service" for those contracts was the construction and operation of the pilot plant. The hearing officer explained that the Department was confusing the performance of the service with the product of the service. The hearing officer found that the product of service was data generated by TPL's research efforts. We think it is necessary to draw the same distinction between the service performed and the product of service for the IOC contracts. TPL was paid to transform the munitions into components. This transformation did not constitute the product of the service, but the service itself.

{14} The Court of Appeals offered a different description of the product of service in this case. The Court of Appeals explained that "the term product refers not only to tangible objects that have been assembled, but also to results or consequences that might yield lesser objects, whether in terms of weight, quantity, or chemical composition, than existed prior to any action having been initiated." *TPL*, 2000–NMCA–083, ¶ 13, 129 N.M. 539, 10 P.3d 863. That court then concluded that the product of the service was "not only neutralized materials but, more importantly, the ability to dispose of the inert munitions in an environmentally reasonable way." *Id.* ¶ 14.

{15} We believe that neither of these was the "product of the service." First, IOC did not pay for the mere "ability" to dispose of the munitions. IOC had the ability to dispose of the munitions as soon as it accepted a bid for this contract, if not earlier. It paid to have the service complete. More importantly, we think the Court of Appeals erred in focusing on tangible objects—neutralized materials—as the product of service. The Court of Appeals believed, and the dissent continues to argue, that IOC paid for "inert munitions." The dissent postulates that IOC "used" those munitions by having TPL recycle them. One problem with this construction is that recycling and disposal were components of the services TPL provided. The contracts called for TPL to not only demilitarize the munitions, but to dispose of them, either by recycling, by resale or through hazardous waste disposal. We therefore do not agree that we can reasonably infer from the facts presented to the hearing officer that the undisposed, demilitarized munitions constituted a "product of the service" that was used by or delivered to IOC in order to support the hearing officer's conclusions. Both the Court of Appeals and the dissent arbitrarily divided the services required under the contracts, even though the Depart-

ment made no effort to sever the components of the contracts. The Department sought to tax all of TPL's receipts from these contracts, not the demilitarization portion alone. Nor do we think this case is analogous to *In re Protest of TASC, Inc.*, No. 97–31 (N.M. Taxation & Revenue Dep't Aug. 22, 1997), *available at* http://www.state.nm.us/tax, where a hearing officer held that a product of service could result from services even where those services were not completed. In that case, the taxpayer was conducting research experiments. *Id.* at 11–12. The experiments failed. The hearing officer concluded that the buyer received benefits from the failed experiment, even though the services were only partially performed *Id.* Here, there is no need to apply the same reasoning. TPL completed both its demilitarization and disposal services, as required under its contracts. We think there is a difference between finding a benefit from partially completed services and examining only part of the completed services in order to identify a product of service that fits the Department's construction of the statute. There is no need to examine a product of service resulting from the demilitarization alone when the entire service was performed.

{16} Interestingly, we think the Department offers the most appropriate description of the product of TPL's services. The Department notes that the ultimate benefit IOC received from TPL's services was the "freedom from responsibility for dangerous munitions." We agree that this is the benefit that IOC sought when hiring contractors to demilitarize and dispose of its unwanted munitions. Contrary to the Court of Appeals' and the dissent's views, this "product" was wholly intangible. The question remains, however, whether TPL met its burden to establish that IOC neither made initial use nor took delivery of that product in New Mexico.

*Initial Use*

■ {17} NMSA 1978, § 7–9–3(O) (2002), defines initial use as the "first employment for the intended purpose." Under the plain language of the statute, we must focus on the activities of the buyer—or its employees or agents—in determining whether the buyer made initial use or took delivery of the seller's services in New Mexico or elsewhere. *See* § 7–9–57(C). TPL argues that IOC had no presence in New Mexico throughout the relevant period, and therefore neither initial use nor delivery could have taken place within this state. The Department argues that buyer's physical presence within the state is not necessary for the buyer to make use or take delivery of the product of service within the state.

{18} The Department notes that the legislature provided the deduction in Section 7–9–57 out of concerns about competition with business from other states. Unlike New Mexico, the vast majority of states do not impose taxes on services. *See* 2 Jerome R. Hellerstein & Walter Hellerstein, *State Taxation II*, Table 12.10 (3d ed. 2000) New Mexico businesses providing services to out-of-state customers would therefore be at a competitive disadvantage with firms from other states if required to pay gross receipts tax on its income from those services. For example, a New York magazine seeking an article on new car models could hire an automotive writer in any state. Since most states do not tax services, a New Mexico writer would be at a five percent price disadvantage compared with writers in other states. Section 7–9–57 allows the writer to claim a deduction for the fees he or she earns from writing the article if the article is delivered to the publisher in New York, by mail or otherwise. Section 7–9–57 puts the New Mexico writer on a level playing field with writers in other states.

{19} TPL's other military contracts, those with the Naval Surface Warfare Center, also provide a relevant example. For those contracts, TPL conducted research in New Mexico, and sent monthly reports to the Center in Indiana. The hearing officer concluded that there was no initial use or delivery in New Mexico. In contrast, in *TASC*, the taxpayer, who was conducting research and developing software, sent monthly reports to Phillips Laboratory in Albuquerque. *TASC*, No. 97–31, at 11–12. There, the hearing officer easily found that delivery took place in New Mexico. *Id.* While the latter example dealt with delivery, not use, we

think both of these examples represent a straightforward application of the statutory language, providing that receipts from services provided to out-of-state buyers are only taxable when the buyer makes initial use or takes delivery of the "product of the service" in New Mexico.

{20} By imposing the requirement that initial use or delivery cannot take place in New Mexico, the legislature restricted the deduction to situations where competition with firms from other states is of paramount concern because the service could be performed equally well in any state. On the other hand, those businesses that provide services to customers within the state will not suffer the same competitive disadvantage when required to pay the gross receipts tax. For example, many businesses in New Mexico provide services primarily to out-of-state tourists, who could be considered out-of-state buyers. Because those tourists have already come to New Mexico, however, there is no concern about competition with businesses from other states. A Santa Fe business that provides massages, for example, is primarily in competition with other massage businesses within Santa Fe. Accordingly, the statute would not provide a deduction for that business simply because a customer was from out of state. In such a situation, the buyer is personally present in New Mexico to make use and take delivery of the services in New Mexico. In addition, a buyer who is not physically present within this state can make use or accept delivery of a service through agents within the state. *See Phillips Mercantile Co. v. Taxation & Revenue Dep't*, 109 N.M. 487, 488–89, 786 P.2d 1221, 1222–23 (Ct.App.1990) (holding that taxpayer exercised control over catalogs and inserts distributed in New Mexico through its contractual relationship with a mailing service and New Mexico newspapers.)

{21} The Department argues that a buyer who is not personally present within the state and has no employees or agents within the state can still make initial use or take delivery of the product of service within the state. It presents the hypothetical example of a nonresident property owner who hires a New Mexico company to provide lawn mowing services on its New Mexico property. The Department posits a number of other hypothetical examples involving similar improvements to real property where the service provider is hired to remove, rather than create, something. The examples include a plumber hired to remove a clog from a sink, a carpet cleaning service hired to remove dirt, a landscaping service hired to remove a tree from outside a home, or a crew hired to remove asbestos from a building. We think the key factor in any of these scenarios is the necessity that the services be performed upon the real property within New Mexico. The property owner, even if not personally present in New Mexico, would take delivery of the service at his or her real property within New Mexico, and would make use of the service, either personally or through an agent, at the real property in New Mexico. As the Department itself indicated, "[a] vacation home owner uses the product of its house-cleaner's services (a clean house) when it rents the house to others, without ever entering the state."

{22} We do not think the same is necessarily true when services are performed on movable, personal property that is not located within New Mexico before the contract is initiated. The Department seeks support for its position in *Reed v. Jones,* 81 N.M. 481, 468 P.2d 882 (Ct.App.1970). In *Reed,* a Texas bakery sent its bread delivery truck to a Roswell, New Mexico, garage for repairs. *Id.* at 481–82, 468 P.2d at 882–83. Upon completion of the repairs, the truck was returned to Texas. *Id.* The garage argued that it was entitled to the tax deduction because the bakery used the truck in Texas, not New Mexico. The Court of Appeals held that the services were taxable because "initial use occurred in New Mexico." *Id.* at 482, 468 P.2d at 883. In its factual discussion, the court noted that once repaired, "the truck was driven back to Amarillo, Texas." *Id.* The court's use of passive voice is unfortunate because the question under the statute is whether *the buyer* made initial use of the service in New Mexico.

{23} The Department argues that it is irrelevant whether or not the buyer in that case came to New Mexico to retrieve the

truck. It was sufficient, the Department argues, that the buyer had the benefit of a functioning vehicle, and the vehicle "was rendered fit for driving in New Mexico." We do not agree that a buyer's use within the state can be imputed from the presence of personal property shipped into the state, as it can when real property is located within the state. An out-of-state buyer does not automatically make initial use or take delivery of services within New Mexico when services are performed upon its personal property sent to New Mexico. To the extent that *Reed* suggests otherwise, we now clarify that the buyer must perform some identifiable activity within the state that constitutes initial use or acceptance of delivery.

{24} The dissent also argues that we erroneously focus on the policy behind the statute in reaching our conclusion. In interpreting a statute, however, we "search for and effectuate the legislative intent—the purpose or object—underlying the statute." *Bd. of Comm'rs v. Greacen,* 2000–NMSC–016, ¶ 4, 129 N.M. 177, 3 P.3d 672 (quoting *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994)); *see also Rauscher,* 2002–NMSC–013, ¶ 32, 132 N.M. 226, 46 P.3d 687 ("[T]he ultimate goal is a determination of what the Legislature intended . . . ."). Thus, where there are compelling reasons to believe the legislature intended to allow a deduction, we think it is inappropriate to adhere rigidly to the presumption that the legislature intends to tax all business transactions and to stretch the statutory language beyond its intended purpose.

{25} The personal property involved here—the energetics—was not present in New Mexico before TPL won the demilitarization contract. The munitions were sent to TPL so the company could perform the contracted services. If TPL received the energetics, demilitarized them, then shipped them back to IOC in Illinois, we think it would be clear that IOC both made initial use and took delivery in Illinois. The only difference here is that IOC did not want the munitions returned, but wanted TPL to dispose of them.

{26} Both the hearing officer and the Court of Appeals determined that initial use took place in New Mexico because transfer of title to the munitions took place in New Mexico. The Court of Appeals concluded that initial use occurred when title was exchanged, because at that point IOC no longer had responsibility for the munitions that had been shipped to TPL. *Id.* TPL argues that IOC was in fact free from responsibility earlier, when it shipped the munitions to TPL, even though title had not yet transferred. We note that there was no finding of fact from the hearing officer establishing that IOC maintained responsibility until title was transferred, and thus the Court of Appeals' determination is not entitled to any deference. Nonetheless, even if the transfer of title represented the point at which IOC received the benefit of the contract, and therefore initial use occurred at that point, we still do not agree that IOC's initial use occurred *in New Mexico.* To reach that conclusion, the Court of Appeals erroneously applied the rules governing the sale of goods to this transaction, which instead involved the provision of services and the transfer of an intangible benefit. Transfer of title occurred in New Mexico because the inert munitions were in New Mexico at the time the transfer of title took place. *See Pittsburgh & Midway Coal Mining Co. v. Revenue Div., Taxation & Revenue Dep't,* 99 N.M. 545, 554, 660 P.2d 1027, 1036 (Ct.App.1983) (citing *State Tax Comm'n of Utah v. Pac. States Cast Iron Pipe Co.,* 372 U.S. 605, 83 S.Ct. 925, 10 L.Ed.2d 8 (1963)). In cases involving the sale of goods, the place of transfer of title determines where the transaction is taxable. *Id.* ("[W]here a vendor sells property, and passage of title and delivery occurs in the vendor state, that state can levy and collect the sales tax on that transaction."). Thus, if this case involved the sale of goods, New Mexico would have taxing authority. This case does not, however, involve the sale of goods, and we do not think the fact that the munitions were in New Mexico at the time title was transferred means that IOC received its intangible benefit, the freedom from responsibility for the munitions, in New Mexico. When IOC received that benefit, it was in Illinois. When TPL completed its

services, IOC was in Illinois. As TPL has pointed out repeatedly, IOC was never in New Mexico. It conducted no identifiable activity within the state that constitutes initial use here. Thus, we do not agree that the place where title is transferred determines where initial use occurred in this case.[2]

{27} Like the Court of Appeals, the dissent focuses on the tangible objects—the inert munitions—as the product of service in this case. From that conclusion, the dissent reasons that "IOC used the inert munitions by having them recycled by TPL." Even if we accepted this formulation of initial use, we note that the record does not show where the munitions were recycled or where other means of disposal took place. TPL asserts that most of the disposal took place outside of New Mexico. Instead, the munitions were readied for recycling—and disposal—in New Mexico. The dissent's theory—yet another new theory proposed to explain why taxation is appropriate in this case—still does not explain how TPL's actions in performing its demilitarization service in New Mexico constituted use by IOC in New Mexico.

*Delivery*

■ {28} The hearing officer also concluded that delivery took place within New Mexico because TPL's services were performed on "IOC property." She based her conclusion on evidence in the record showing that TPL had reduced its price for one of its three contracts with IOC after it obtained approval to use Fort Wingate rent free. By finding that IOC had control over Fort Wingate, the hearing officer was able to rely on the principles discussed above relating to services provided on real property. Essentially, the hearing officer sought to impute IOC's presence through its control of the property, even though IOC had no employees or agents present in New Mexico. TPL argues that there was no evidence to support the finding that IOC had control or authority

over Fort Wingate. The Court of Appeals did not reach the issue because it concluded that IOC had made initial use of the services when it transferred title of the munitions to TPL. *See TPL*, 2000–NMCA–083, ¶ 17, 129 N.M. 539, 10 P.3d 863.

■ {29} An agency's factual decision "will be affirmed if it is supported by substantial evidence in the whole record." *Chavez v. Mountain States Constructors*, 122 N.M. 579, 584, 929 P.2d 971, 976 (1996). We agree with TPL, however, that there was no evidence to support a finding that IOC had control over Fort Wingate. The hearing officer relied solely on a memorandum indicating that TPL had obtained "approval" to use Fort Wingate rent-free. That document, however, does not state that approval came from IOC or explain what role, if any, IOC played in helping TPL obtain permission to use the facility or to use it free of charge. The record instead shows TPL independently sought approval to use Fort Wingate to perform its services. In addition, the record shows that the ultimate decision rested with the Army Corps of Engineers and Base Transition Coordinator, who was in charge of the facility after it was closed under the terms of the Base Realignment and Closure Act. Nonetheless, even if IOC had some influence over the Base Coordinator's decision, or was able to arrange for TPL's use rent-free, we do not agree that this was sufficient evidence to conclude that IOC had control over the Fort Wingate facility. IOC was never present at the facility and was not in charge of the facility. We note that in its briefs before this Court and the Court of Appeals, the Department has failed to defend the hearing officer's conclusion that IOC accepted delivery of TPL's services in New Mexico because it had control over TPL's use of Fort Wingate.

{30} Furthermore, these same facts show that this is a case where the legislature's concerns about competition are paramount.

---

**2.** The hearing officer found the transfer of title relevant because TPL reduced its contract price in exchange for the ability to keep any proceeds from the sale of recovered materials. The Court of Appeals rejected this conclusion as unsupported by the record, and the Department has not defended the hearing officer's conclusion. None-

theless, to the extent that the transfer of title in this case represented consideration to TPL, we think that the rendering of consideration cannot constitute initial use by IOC. Had IOC instead mailed a check to TPL as "consideration," we would have great difficulty describing that act as initial use of the product TPL's service.

IOC put out a general notice for bids. There was no requirement that the services be performed in New Mexico. Had another firm won the bid, then the services would have been performed elsewhere. TPL would be at a competitive disadvantage in facing firms from other states if required to pay gross receipts tax on these contracts.

*Burden of Proof*

{31} We recognize that the burden of proof is on the taxpayer to prove that it is eligible for the deduction. Here, TPL was required to prove a negative—it had to prove that another entity, IOC, did not do anything within this state that could constitute initial use of its product of service or acceptance of delivery of its product of service within the state. We think TPL met its burden to establish that it was entitled to the deduction, or more specifically that the statutory exception did not apply, by demonstrating that IOC had no employees or agents in New Mexico and conducted no activities within the state that could constitute use or acceptance of delivery. Once TPL made that showing, the hearing officer could not properly determine that use or delivery took place within this state without some affirmative evidence in the recording supporting such a conclusion. Although several different theories have been put forward to support taxation in this case, we do not think any has satisfactorily explained what IOC activity constituted initial use or acceptance of delivery within New Mexico. Because TPL established that it was eligible for the deduction granted under Section 7–9–57, we reverse the judgment of the hearing officer and the Court of Appeals.

**CONCLUSION**

{32} The statute provides a deduction from the gross receipts tax to those businesses that export services to out-of-state buyers. TPL met its burden to prove that its buyer, IOC, neither made initial use nor took delivery of TPL's services in New Mexico. We therefore reverse the judgment of the hearing officer and hold that TPL is entitled to deduct the receipts from its contracts with IOC. Because we reverse the judgment on this basis, we need not address

TPL's contention that it was denied due process of law in the hearings below.

{33} **IT IS SO ORDERED.**

FRANCHINI and KENNEDY, JJ., concur.

MINZNER, J. (Dissenting).

SERNA, C.J. (Dissenting).

MINZNER, Justice (dissenting).

{34} I respectfully dissent. I concur with the majority that TPL's services, sold to IOC, an out-of-state buyer, resulted in a product. I also concur with the majority that IOC did not make initial use or take delivery of the product by transferring title to TPL. I am not persuaded, however, by the majority's conclusion that the product of the service was "wholly intangible," or that initial use or delivery of that product did not occur within New Mexico. *See* Majority Op. ¶¶ 16, 26. I would affirm the Court of Appeals and the hearing examiner by holding that TPL did not meet its burden of overcoming the statutory presumption that the receipts were subject to gross receipts tax.

{35} As the majority recognizes, our legislature has imposed upon us a presumption that "all receipts of a person engaging in business are subject to the gross receipts tax." NMSA 1978, § 7–9–5(A) (2002). This presumption must not be taken lightly. The majority further recognizes that if a taxpayer claims a tax deduction, we must construe the statute giving rise to such deduction "strictly in favor of the taxing authority, the right to the ... deduction must be *clearly and unambiguously expressed in the statute,* and the right must be clearly established by the taxpayer." *Sec. Escrow Corp. v. State Taxation & Revenue Dep't,* 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App.1988) (emphasis added); *accord ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't,* 1998–NMCA–078, ¶ 4, 125 N.M. 244, 959 P.2d 969 ("We presume that the Department's assessment [of gross receipts tax] was correct. This Court may reverse the hearing officer's decision and order only if it is: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3)

otherwise not in accordance with the law." (internal quotation and citation omitted)). It is not sufficient for the taxpayer to have an arguable basis for being entitled to the deduction, with which this Court could choose to agree or disagree. *See* NMSA 1978, § 7–1–17(C) (1992) ("Any assessment of taxes or demand for payment made by the department is presumed to be correct."). The taxpayer must show that it is clearly entitled to the deduction under the statutory scheme. *Cf. ITT*, 1998–NMCA–078, ¶¶ 4, 14–16, 125 N.M. 244, 959 P.2d 969 (applying Section 7–1–17(C) and affirming the Department's interpretation of the word "service" in the gross receipts tax statute).

{36} The transaction between the parties in this case was unique, and therein lies the difficulty this Court experiences in applying the statutory deduction scheme to it. The seller of the service, TPL, took possession of the munitions, which were the objects of the contract. The buyer, IOC, paid TPL to do this and to make those munitions inert. IOC retained its ownership of the munitions throughout the contract period until the time when TPL had completed the process of demilitarizing the munitions. This is the reverse of the typical case, where the seller of a service produces something that never belonged to the buyer, then provides it to the buyer. As a result, identifying the "product of the service" is perhaps more difficult in this case than in most.

{37} The majority takes the position that the product of the service was "wholly intangible," perhaps because it cannot point to any object that IOC physically received as a result of TPL's service. The majority, therefore, identifies the product of the service as " 'freedom from responsibility for dangerous munitions.' " Majority Op. ¶ 16. The logic of this conclusion is somewhat appealing, because this freedom from responsibility is a clear end result of the contract between IOC and TPL. In my view, however, it would be more appropriate to identify a tangible product, both because such a product does exist in this case, and because once we do this, the determination of where the buyer initially used that product becomes possible. To do this, we must cross over the mental hurdle of

accepting the possibility that the product of the service never has to be put into the buyer's hands. It then becomes easier to identify the product of TPL's service as the inert munitions themselves. Those munitions are "what the buyer paid for." The majority implicitly recognizes that this is the case by hypothesizing that "[i]f TPL received the energetics, demilitarized them, then shipped them back to IOC in Illinois, we think it would be clear that IOC both made initial use and took delivery in Illinois." Majority Op. ¶ 25.

{38} Once we have identified the product of the service as the inert munitions themselves, we still must decide whether IOC made initial use or took delivery of the product within New Mexico. Under the statutory scheme, " 'use' " includes "use, consumption or storage other than storage for subsequent sale in the ordinary course of business or for use solely outside this state." NMSA 1978, § 7–9–3(L) (2002). Initial use "means the first employment for the intended purpose." Section 7–9–3(O). Under the majority's formulation, it becomes impossible to determine where IOC "used" the "freedom from responsibility" for the munitions. The product of the service identified by the majority is never really "used" at all.

{39} It is important to first recognize that one can "use" the product of a service without ever gaining physical control over it. *Phillips Mercantile Co. v. N.M. Taxation & Revenue Dep't*, 109 N.M. 487, 488, 786 P.2d 1221, 1222 (Ct.App.1990). In this case, IOC never regained physical control of the munitions once TPL had performed its service by rendering them inert. This does not change the fact that IOC's intended use of the inert munitions was to recycle them. This is evidenced by the fact that TPL reduced the contract price substantially because IOC allowed it to do just that. The Hearing Examiner noted that in its contract proposal, TPL stated that "the 'primary goal' of its demilitarization work was 'to reutilize the materials from our demilitarization activities, preserving as much as possible of the high quality energetic materials used in military munitions and retaining the maximum economic value of those materials.' " *Protest of TPL,*

*Inc.*, No. 99–17, at 11 (N.M. Taxation & Revenue Dep't, Apr. 5, 1999). IOC used the inert munitions by having them recycled by TPL. IOC could have chosen to recycle the materials itself, back in Illinois. This would have constituted initial use outside of the State of New Mexico, and TPL would then have been entitled to the deduction. The parties to the contract instead decided that they would rather have TPL reduce the price it charged for demilitarization services substantially, however, and recoup the difference through the profits it received by selling the munitions to third parties. TPL took this action within the State of New Mexico. I cannot say, therefore, that NMSA 1978, § 7–9–57 (1989, prior to 1998 & 2000 amendments) clearly and unambiguously provides that TPL should be exempted from payment of gross receipts tax for the services that it provided to IOC.

{40} I am not unmindful of the majority's position that the policies behind the deduction allowed for in Section 7–9–57 are furthered if TPL is allowed to receive the deduction. I agree that TPL may be placed in a competitive disadvantage with other companies seeking the same work who do not have to pay gross receipts tax in their respective states. The Department conceded at oral argument that a gross receipts tax deduction for TPL would be good policy, but that the statute simply does not allow for such a deduction as it is currently written. I agree. It is not this Court's place to allow for the exemption when the statute does not, even if the policies behind the statute may be furthered by doing so. *See Rauscher, Pierce, Refsnes, Inc. v. Taxation & Revenue Dep't*, 2002–NMSC–013, ¶ 11, 132 N.M. 226, 46 P.3d 687 ("[T]axation is the rule and the claimant must show that his [or her] demand is within the letter as well as the spirit of the law." (internal quotations and citations omitted)).

{41} I conclude that TPL did not meet its burden of demonstrating that it should clearly receive the gross receipts tax exemption found in Section 7–9–57. The evidence demonstrates that the demilitarized munitions themselves, as well as the freedom from responsibility for those munitions as they

existed prior to TPL's services, could be characterized as products of the service. I would therefore affirm the Court of Appeals. A majority of the Court concluding otherwise, I respectfully dissent.

SERNA, C.J., concurs.