477 P.2d 827

**PAN AMERICAN PETROLEUM CORPO-RATION, a corporation, Plaintiff-Appellee,**

v.

**EL PASO NATURAL GAS COMPANY, a corporation, Defendant-Appellant.**

**No. 8989.**

Supreme Court of New Mexico.

Dec. 14, 1970.

Montgomery, Federici, Andrews, Hannahs ·& Morris, Santa Fe, Hardie, Grambling, Sims & Galatzan, El Paso, Tex., for defendant-appellant.

Atwood, Malone, Mann & Cooter, Bob F. Turner, Roswell, Harry O. Hickman, R. H. Landt, Fort Worth, Tex., for plain-·tiff-appellee.

## OPINION

SISK, Justice. ·

Defendant El Paso Natural Gas Company appeals from a declaratory judgment in favor of plaintiff Pan American Petroleum Corporation, which judgment found and concluded that natural gas had been "manufactured" and "materially changed" in El Paso's gas processing plants. The parties will be referred to as El Paso and Pan American.

Between 1948 and 1963, El Paso, as buyer, and Pan American, as seller, entered into a series of gas purchase agreements, each of which provided:

> "In the event that any tax now in force and levied or assessed on or against the gas delivered hereunder up to the point of delivery is increased, or in the event that any new or additional tax is hereafter levied or assessed by the State of New Mexico, in respect to or applicable to the gas to be delivered by Seller to Buyer under this agreement, the amount of such increase or new or additional tax shall be divided between and borne ¾ by Buyer and ¼ by Seller. * * *"

Prior to 1963 Pan American claimed and received the benefit of an exemption from a two percent privilege tax on the gross receipts of producers of natural resources, including oil and natural gas, under the Emergency School Tax Act. The Legislature in 1935, by the then § 72–16–4, N.M. S.A.1953, provided in its material part:

> "* * * Any person engaging or continuing in any of the businesses taxed by this [Paragraph] (A) who shall sell such minerals, timber or other natural resource products to a person engaged in the business of refining, smelting, reducing, compounding, manufacturing or otherwise preparing for sale or use as manufactured or partly manufactured products, such minerals, timber, or .other natural resource products, so that the char-

acter or condition thereof is materially changed, in mills or plants located in this state, and taxable under [Paragraph] (B) of this [section], shall not be required to include in the amount of tax imposed by this section any gross receipts derived from such sales of minerals, timber or other natural resource products to such persons; * * *"

This exemption was applicable only if the natural gas was "manufactured or partly manufactured" so that its character or condition was "materially changed."

An exemption using the identical language, so far as here material, was included in 1959 in the then § 72–21–4, N.M.S. A.1953, of the Oil and Gas Emergency School Tax Act. Pan American continued to claim and receive the benefit of the exemption. In 1963 the Legislature entirely eliminated the exemption, and by amendment to § 72–21–4, supra, imposed a tax at a rate of 2.55%.

El Paso alleges that the processing to which it submits natural gas bought from Pan American does not constitute the production of a "manufactured" and "materially changed" product as originally contemplated by the repealed exemption provisions, and therefore Pan American was never entitled to the exemption it had claimed prior to the enactment of the 1963 acts, supra. Extending this reasoning, El Paso states that the tax of 2.55% imposed in 1963 merely increased the old tax by .55% and therefore it is only obligated to pay ¾ of that increase, because that is the only "new or additional" tax levy within the terms of the gas purchase agreements.

The position of Pan American, and the decision of the trial court, is that El Paso is contractually obligated to make reimbursement of ¾ of the total tax of 2.55%, because such processing results in "manufactured or partly manufactured" products, the character or condition of which was "materially changed," the now eliminated exemptions were properly claimed, and the 1963 tax was "new or additional."

To facilitate the lower court's determination of the issue as related to "manufacturing" and "material change," the parties stipulated the facts concerning the processing of natural gas in El Paso's plants, which were incorporated in the court's findings of fact. Therefore, it must be determined if, as a matter of law, the lower court was correct in its findings and conclusions, as based on the facts before it.

El Paso buys large quantities of natural gas from Pan American. When purchased, this gas is not marketable in its raw form because of certain constituents which are either harmful to the gas transmission lines of El Paso, or possibly injurious to its ultimate consumers. Through elaborate processing, these elements are removed. In addition, certain liquid by-products are derived from this processing technique which constitute valuable commodities in themselves. These liquid by-products make up ⅕ of the total value of all of the products sold by El Paso which are derived from its processing of the raw natural gas purchased by it from such suppliers as Pan American. Yet, El Paso contends that it buys its product as natural gas, and eventually sells that product as natural gas, without materially affecting it in such a way as to constitute manufacturing.

Whether properly called a finding of ultimate fact or a conclusion of law, the most critical determination of the trial court was:

"47. The defendant, at all times material to this action, has been engaged in the business of refining, reducing, compounding, manufacturing, or otherwise preparing natural gas for sale or use as a manufactured or partly manufactured product, so that the character or condition thereof is materially changed in its gas processing plants located in the State of New Mexico. It was necessary that the gas before being transported in the pipelines of the defendant, be processed so that the liquids therein could be re-

moved so that the gas could be delivered to the consuming public in a safe condition and so that water or other impurities in the gas be removed to prevent the corrosion of plaintiff's pipelines and to render same satisfactory for sale to the consuming public."

Apparently there is no directly applicable case law concerning the nature of the processing of natural gas, and it is of little help to compare the vast number of cases which consider innumerable disparate products and conclude that a particular product is, or is not "manufactured" under the particular facts or the particular law of that particular case. El Paso cites cases wherein the pasteurization of milk, the preparation of sea shells for ornamentation, and the processing of chickens were not held to constitute manufacturing as that word was used in its there context. See Rieck-McJunkin Dairy Co. v. Pittsburgh School District, 362 Pa. 13, 66 A.2d 295 (1949); Hartranft v. Wiegmann, 121 U.S. 609, 7 S.Ct. 1240, 30 L.Ed. 1012 (1887); East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 (1956). In turn, Pan American cites cases involving railroad tie construction, oil refining, and sea food processing which it believes support its allegation that the processing of natural gas under the here applicable tax statutes is also manufacturing. See Iden v. Bureau of Revenue, 43 N.M. 205, 89 P.2d 519 (1939); Appeal of Atlantic Refining Co., 398 Pa. 30, 156 A.2d 855 (1959); Bornstein Sea Food, Inc. v. State, 60 Wash.2d 169, 373 P.2d 483 (1962). However, none of these cases is directly applicable, and it is not possible to decide this case on the basis of which case or line of cases are more analogous to the stipulated facts of our case. As stated in 55 C.J.S. Manufactures § 3, page 680:

"* * * In determining what constitutes manufacture there is no hard and fast rule which can be applied generally. Each case must be decided under its own facts, having regard for the sense in which the term may be used in the particular instance, and the intent or purpose to be accomplished. * * *"

■■ We must approach the problem by examining the specific tax statutes involved, to determine whether the Legislature intended to include or exclude the processing of natural gas when it originally exempted "manufactured" products from this tax. Phrased differently, did the 1963 Legislature change or expand the meaning of "manufacturer," or merely specifically define that word to have the same meaning as under the previous statutes? A statute is to be interpreted as the Legislature understood it at the time it was passed. Burch v. Foy, 62 N.M. 219, 308 P.2d 199 (1957); State v. Thompson, 57 N.M. 459, 260 P.2d 370 (1953).

Pan American argues, and El Paso agrees, that in granting the tax exemptions involved here, the Legislature intended to provide incentive for the construction and operation of industrial facilities in New Mexico. In construing these statutes, this legislative purpose should be considered. P. Lorrilard Co. v. Ross, 183 Ky. 217, 209 S.W. 39 (1919). By 1963 the Legislature determined to eliminate those exemptions and to impose a 2.55% privilege tax. Yet, aside from eliminating the exemption, the language of the 1963 acts is substantially similar to that of the previous acts, and there is no reason to believe that the acts are an entirely new creation of the Legislature, unfounded upon their predecessors.

The tax provisions involved in this case repeatedly refer to "oil and natural gas." In treating these two products together, it seems unlikely that at the same time the Legislature should choose to treat the taxation of the processing of these hydrocarbons in a different manner, without specifying such an intent. The Oil and Gas Emergency School Tax Act, supra, prior to the 1963 amendment, applied to "oil, natural gas or liquid hydrocarbons," which Act included a restatement of the tax ex-

emption originally contained in the Emergency School Tax Act, supra. The 1963 Oil and Gas Manufacturers Privilege Tax Act, in § 72–23–2, N.M.S.A.1953 (Supp. 1969), expressed the definition of "manufacturer" as follows:

"B. 'Manufacturer' means a person who:

"(1) Refines or processes oil, natural gas or liquid hydrocarbon, individually or any combination thereof; or

"(2) Extracts by-products from oil, natural gas or liquid hydrocarbon, individually or any combination thereof; * * *"

Clearly, under this definition, El Paso's natural gas processing operation does constitute "manufacturing." We cannot accept the argument that this definition is one which has been newly imposed by the Legislature and that under the earlier acts an entirely different meaning, which would exclude natural gas processing from the definition of "manufacturing," was intended. The purpose of the 1963 Oil and Gas Manufacturers Privilege Tax Act, which included the codification of the definition of "manufacturer," disavows any such implication of intent to create a new definition of that word, stating in § 72–23–3, N. M.S.A. 1953 (Supp. 1969):

"The purpose of this act * * * is to eliminate interrelated and interdependent provisions of taxation upon producers and manufacturers of oil, natural gas and liquid hydrocarbon, and to effect efficient administration and collection procedures by amending the Oil and Gas Emergency School Tax Act * * * and by eliminating the application of the provisions of the Emergency School Tax Act * * * as they apply to manufacturers of oil, natural gas or liquid hydrocarbon, and substituting therefor this Oil and Gas Manufacturers Privilege Tax Act * * *

"The legislature hereby declares its express intent that this amendment and substitution shall not constitute a new or

an additional tax upon either the producer or manufacturer of oil, natural gas or liquid hydrocarbon as contemplated in gas purchase contracts commonly used in the natural gas industry; Provided, however, that in the event of any conflict between the provisions of the Emergency School Tax Act * * * and this Oil and Gas Manufacturers Privilege Tax Act, the provisions of only one [1] of these laws shall apply."

The purpose and intent expressed by this statute is that of clarification; elimination of confusion, inconsistency, or conflict; increased efficiency; and clearly shows that only one tax shall be imposed. The reference to no "new or additional" tax on the producer or manufacturer as contemplated by commonly used gas purchase contracts, in view of the nature of the act, can only have effect upon the Oil and Gas Emergency School Tax Act, supra, as amended in 1963, which was being supplemented. The Legislature pointed out explicitly the effects which this Oil and Gas Manufacturers Privilege Tax Act was to have on the act it was supplementing, in an effort to eliminate any confusion which might arise from the continued existence of two acts applicable to the same or similar areas.

We therefore believe that the above-quoted statutory definition of "manufacturer" was an expression of consistency with, or clarification of, existing law in this area of taxation, and not an entirely new statement of legislative intent, and that, when considered with the stipulation of facts summarized above, the trial court's Finding of Fact No. 47, quoted above, was factually and legally correct.

El Paso concedes that the increase from two percent to 2.55% was an "additional tax," 3/4 of which it is now obligated to pay under the terms of the gas purchase agreements. Yet they argue that all of the remainder of the tax had always been erroneously exempted and therefore cannot be construed as an increased, new, or addi-

tional tax contemplated by their long-existing contractual agreements. Having determined that Pan American was entitled to the exemptions claimed under previous acts, the net result was that Pan American paid no taxes until the 1963 acts imposed the tax of 2.55% with no exemption provisions. Therefore, we must agree with the trial court that there then arose a tax of 2.55%, ¾ of which El Paso had contracted to pay, because Pan American is now paying a tax of 2.55% which tax it was neither paying nor was obligated to pay at the time the gas purchase agreements were entered into.

In its second point, El Paso asks us to review our determination in Pan American Petroleum Corporation v. El Paso Natural Gas Co., 77 N.M. 481, 424 P.2d 397 (1966), where we held that the Courts of the State of New Mexico have jurisdiction over the subject matter of this action. We have done so, and we reaffirm our prior decision.

The judgment is affirmed. It is so ordered.

TACKETT and McKENNA, JJ., concur.