2003-NMCA-092

74 P.3d 96

**AMOCO PRODUCTION CO., Conoco, Inc., Texaco Exploration and Production, Inc., Vastar Resources, Inc., Phillips Petroleum Company, Devon Energy Corporation (Nevada), and Blackwood & Nichols Co., a limited partnership, Plaintiffs–Appellants,**

v.

**NEW MEXICO TAXATION AND REVENUE DEPARTMENT, Defendant–Appellee.**

**No. 22,061.**

Court of Appeals of New Mexico.

July 2, 2003.

Sarah M. Singleton, Carolyn A. Wolf, Montgomery & Andrews, P.A., Santa Fe, NM, for Appellants.

Patricia A. Madrid, Attorney General, Bridget A. Jacober, Special Assistant Attorney General, Santa Fe, NM, for Appellee.

## OPINION

CASTILLO, Judge.

{1} In this appeal we interpret statutes relating to taxation of natural gas. Appellants (Producers) are producers of conventional gas and coal seam gas in the San Juan Basin in New Mexico. They appeal from summary judgments affirming New Mexico Taxation & Revenue Department (TRD) denials of requests for refunds of the Natural Gas Processor's Tax (NGPT). Producers argue: (1) the removal of carbon dioxide from coal seam gas is not processing as contemplated by the Natural Gas Processor's Tax Act (the Act); (2) even if the NGPT is applicable, TRD's ruling has no retroactive effect; and (3) Producers should not have to pay interest and penalties. We affirm as to the first two arguments and the payment of interest but reverse as to the payment of penalties.

## BACKGROUND

{2} We briefly set forth the pertinent procedural history. Prior to 1985, El Paso Natural Gas (El Paso) purchased the entire gas stream from Producers at the wellhead. El Paso used its own gathering and processing system, and sold the gas to its customers. Under this arrangement, El Paso reported and paid the NGPT on the processed gas. In 1986 El Paso discontinued purchasing gas at the wellhead from Producers. Instead, El Paso sold transportation, treating, dehydration, and processing services to Producers, who continued to own the gas. Under this arrangement, El Paso no longer paid the NGPT.

{3} Prior to 1988, El Paso dealt with conventional gas. By late 1988, however, many new coal seam gas wells were drilled in the San Juan Basin. El Paso's conventional processing plants were not designed to treat coal seam gas, which requires removal of carbon dioxide. For this reason, late in 1990, Producers contracted with Meridian Oil Gathering, Inc. (Meridian) and Williams Field Services, Inc. (Williams), who constructed the Val Verde and Milagro plants for the processing of coal seam gas. Thus, instead of El Paso preparing the gas for market, Producers contracted with Meridian and Williams to do so.

{4} Before 1995, TRD had not assessed a NGPT against anyone specifically in connection with coal seam gas. On April 14, 1995, Producer Amoco Production Company (Amoco), requested a ruling from TRD regarding whether it was required to pay a NGPT on coal seam gas. On October 20, 1995, TRD issued Ruling 542–95–01 (Ruling), which concluded that the NGPT was due on coal seam gas from which carbon dioxide was removed at the Milagro and Val Verde plants. The Ruling does not state that the NGPT was to be applied retroactively. TRD subsequently assessed Producers for unpaid NGPT for the period beginning December 1991 through December 1995. Producers paid the assessed amounts, plus interest and penalties, and then sought refunds.

{5} The district court granted summary judgment in favor of TRD concluding that Producers were processors as contemplated by the Act and, therefore, subject to payment of the NGPT. The district court also concluded that the tax was payable retroactively irrespective of TRD's ruling and that interest and penalties were due and not refundable.

## DISCUSSION

### I. Standard of Review

{6} "The standard of review for a motion for summary judgment is whether there are any genuine issues of material fact and whether the moving party is entitled to summary judgment as a matter of law." *Williams v. Cent. Consol. Sch. Dist.*, 1998–NMCA–006, ¶ 7, 124 N.M. 488, 952 P.2d 978. In this case the summary judgment was premised on the trial court's interpretation of the statute. "Issues of statutory construction and interpretation are questions of law which we review de novo." *Pub. Serv. Co. v. Diamond D. Constr. Co.*, 2001–NMCA–082, ¶ 48, 131 N.M. 100, 33 P.3d 651 (internal quotation marks and citation omitted.) Our primary goal in interpreting statutes is to give effect to the Legislature's intent. *State v. Martinez*, 1998–NMSC–023, ¶ 8, 126 N.M. 39, 966 P.2d 747.

### II. Applicability of the Act to Coal Seam Gas Production

{7} In 1998 (effective January 1, 1999), the Legislature made considerable changes to the Act. Significantly, the post–1998 law shifts responsibility for paying the NGPT from interest owners to processors. *See* NMSA 1978, § 7–33–4(A) (1998); *Blackwood & Nichols Co. v. N.M. Taxation & Revenue Dep't*, 1998–NMCA–113, ¶¶ 14–15, 125 N.M. 576, 964 P.2d 137 (discussing changes made by 1998 amendment). It also defines natural gas processing plants to include facilities that extract liquid substances or non-hydrocarbon gases, thereby specifically including plants such as Val Verde and Milagro where carbon dioxide is removed from coal seam gas. *See* NMSA 1978, § 7–33–2(G) (1998). The time period applicable to this case, however, is from December 1991 through December 1995, and for this reason we must apply the pre–1998 law. *See Blackwood & Nichols Co.*, 1998–NMCA–113, ¶ 2, 125 N.M. 576, 964 P.2d 137. Unless otherwise indicated, all refer-

ences to the Act are to the law in effect before the 1998 amendments, specifically NMSA 1978, §§ 7–33–1 to –9 (1963, as amended through 1989), which is included at the end of the opinion as Appendix A.

{8} Producers argue that the Act does not apply to the production of coal seam gas because the removal of carbon dioxide from coal seam gas is not processing as contemplated by the Act. To evaluate Producers' argument, we look first to the workings of the plants.

{9} In this case, the coal seam gas reaches the Val Verde and Milagro plants after it has been through the gathering process, that is, processes between the wellhead separation and the plant. The gas is first drawn from the ground at the wellhead located on the production unit. The gas is then picked up by the gathering system, which consists of a series of interconnected pipes that carry the gas to the Val Verde and Milagro plants. The plants contain equipment to make the gas meet the specifications of interstate pipelines. The plants occupy approximately twenty-four acres and consist of several stand-alone units called trains. At the plants, the coal seam gas is stripped of 100 percent of its carbon dioxide and water to meet pipeline specifications. In order to remove the carbon dioxide, the gas is passed through a tower where it is contacted with an amine solution. This solution is designed to chemically react with the carbon dioxide, thereby removing it from the gas stream. The energy generated by the chemical reaction increases the temperature of the amine solution in the tower by 80 to 100°F. When the solution leaves the tower, it has been chemically converted to a carbamate solution. It is then passed to a regeneration plant where another chemical reaction is employed to convert the carbamate back to amine so it can be recycled through the tower. The carbon dioxide, which is removed from the gas, is then vented into the air.

{10} Producers argue that the removal of carbon dioxide is a form of purification exempted as a "field or lease operation." *See* § 7–33–2(B)(2) (1986) (stating that a processor "does not mean a person who refines or processes oil, natural gas or liquid hydro-carbons or extracts by-products therefrom through a process which is commonly considered a field or lease operation, such as wellhead separation, dehydration, *purification,* desulfurization, compression or trapping" (emphasis added)).

{11} We therefore examine the removal of carbon dioxide at the Val Verde and Milagro plants in light of this exemption. We recognize that some functions, such as dehydration, purification, and sweetening can be performed both at the wellhead, which is a field or lease operation, or in a processing plant. Although the removal of products near the wellhead involves a type of purification via a membrane process, not all the water and carbon dioxide is removed, leaving the coal seam gas unmarketable and unacceptable for interstate pipelines. The process at the Val Verde and Milagro plants, conversely, removes 100 percent of the carbon dioxide, thereby making the gas marketable or acceptable for interstate pipelines.

{12} This distinction between purification via a membrane process and the subsequent process that removes 100 percent of the carbon dioxide is significant. Case law holds that for purposes of the NGPT, "processing" is that which takes place in order for the gas to be marketable or acceptable to interstate pipelines. In *Pan American Petroleum Corp. v. El Paso Natural Gas Co.,* 82 N.M. 193, 477 P.2d 827 (1970), our Supreme Court analyzed the term "manufacturing" as it was defined in the 1963 Oil and Gas Manufacturer's Privilege Tax Act, NMSA 1953, § 72–23–2 (Supp.1969). That definition is similar enough to the definition of "processor" in the Act to permit our reliance on *Pan American* in the present case. In holding that El Paso's actions constituted "manufacturing," our Supreme Court indicated that "the most critical determination" in regard to whether manufacturing took place is that the process made the gas acceptable to interstate pipelines. *Id.* at 195–96, 477 P.2d at 829–30; *see also Hagood–N.M. Trust No. 1 v. Phillips Petroleum Co.,* No. 00–2155, 2001 WL 830275, at *1 (10th Cir.N.M. July 24, 2001) (order and judgment) (noting that coal seam gas has to be "processed to remove carbon dioxide and water before being sold at the

tailgate of the treatment plant"). Removal of 100 percent of the carbon dioxide at the plant results in a change in the inherent nature of the gas, *see, e.g., Calvert v. Panhandle E. Pipe Line Co.*, 255 S.W.2d 535, 539 (Tex.Civ.App.1953), *rev'd on other grounds sub nom. Mich.-Wis. Pipe Line Co. v. Calvert*, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954), and makes the gas acceptable for interstate pipelines. The Act must be read as a whole. The purpose of the tax is to tax the processing of gas. *See e.g.* § 7–33–2(B) (1986) (stating that a "processor" is a person who "processes natural gas"). It does not make sense to think that the Legislature contemplated that the NGPT would disappear because the natural gas at issue is coal seam gas. "The plain language of the statute is the primary indicator of legislative intent." *Gen. Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 76, 703 P.2d 169, 173 (1985). The courts are to "give the words used in the statute their ordinary meaning unless the legislature indicates a different intent." *State ex rel. Klineline v. Blackhurst*, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988). While it is true that the method of preparing coal seam gas for the interstate pipeline does not fit neatly into the language of the Act, it is clear that the Legislature intended to tax the interest owner of natural gas that is processed in New Mexico. *See* § 7–33–2(B). Thus, we conclude that the removal of carbon dioxide at the Val Verde and Milagro plants is not the type of operation contemplated by the exemption.

{13} In addition, Producers refer to the regulation of the Mineral Management Services (MMS) of the Department of Interior regarding the calculation of royalty payments. Producers argue that the TRD Ruling uses the same definition of "processing" that is used in the regulations. 30 C.F.R. § 206.151 (1999). Based on this definition, MMS considers the removal of carbon dioxide the same as dehydration, and as long as the carbon dioxide is not marketed and sold, the cost of removal may be deducted from the value of the gas on which royalty is paid as a processing allowance. The MMS regulations are applicable to all gas production from federal oil and gas leases. 30 C.F.R. § 206.150(a). Their purpose is to establish the value of production for royalty purposes consistent with the mineral leasing laws, other applicable laws and lease terms. *Id.* The NGPT, however, is a tax on processors for the privilege of engaging in the business of processing. § 7–33–4(A). Consequently, Producers' argument fails because we must evaluate the definition of "processing" in the context of the Act and not in the context of the calculation of mineral royalty payments.

■ {14} At the time the Act was written, the only type of gas that was processed was conventional gas. For this reason, the Legislature wrote the Act within the context of processing conventional gas; coal seam gas was not contemplated because it was not being extracted in significant amounts. Nevertheless, we believe the Legislature intended to tax the privilege of processing natural gas irrespective of its by-product. *See Gen. Motors Acceptance Corp.*, 103 N.M. at 76, 703 P.2d at 173; *State ex rel. Klineline* 106 N.M. at 735, 749 P.2d at 1114. The Act levies "a privilege tax on processors for the privilege of engaging in the business of processing based on the value of their products." §§ 7–33–2(B); –4(A) (1986). "A statute [must] be interpreted as the Legislature understood it at the time it was passed." *Pan Am. Petroleum Corp.*, 82 N.M. at 196, 477 P.2d at 830. The fact that a different type of gas was processed does not mean that the Legislature did not intend to tax the processing of such gas. Accordingly, for reasons discussed above, we hold that the Act requires Producers to pay the NGPT on their activities in producing coal seam gas.

### III. Retroactivity of TRD's Ruling

■ {15} The retroactivity of the Ruling is relevant only to Amoco, as it is the only Producer that asked for a ruling. *See* NMSA 1978, § 9–11–6.2(B)(2) (1995) ("[R]ulings shall be written statements of the secretary, of limited application to one or a small number of persons, interpreting the statutes to which they relate, ordinarily issued in response to a request for clarification of the consequences of a specified set of circumstances[.]"). TRD's Ruling correctly sets forth that the Act was applicable to coal seam gas processed at the Val Verde and

Milagro plants between December 1991 and December 1995. The Ruling, however, does not expressly state that it is to be applied retroactively. Amoco argues that because the Ruling fails to expressly provide for retroactive effect, it is relieved of its NGPT obligations from 1991 through 1995 pursuant to the Act. We disagree.

■ {16} The parties agree that the Ruling itself is not afforded retroactive effect because it fails to expressly provide for retroactivity. *See, e.g.,* § 9–11–6.2(H) ("The extent to which regulations, rulings and orders will have retroactive effect shall be stated and, if no such statement is made, they will be applied prospectively only."). However, to extend the Ruling's lack of retroactivity to a conclusion that Amoco is absolved of its tax liability independent of the Ruling goes beyond the scope of Section 9–11–6.2(H). Rulings do not diminish or enlarge statutory law, *see, e.g., Am. Stores Co. v. Comm'r of Internal Revenue,* 170 F.3d 1267, 1277 (10th Cir. 1999); *In re Proposed Revocation of Food & Drink Purveyor's Permit,* 102 N.M. 63, 66, 691 P.2d 64, 67 (Ct.App.1984), and there is no authority for the proposition that the Ruling somehow changed the law in effect prior to the Ruling or that the applicability of the Act was contingent on the issuance of a ruling. Whether or not the Ruling has retroactive effect is limited to the Ruling itself, and any failure to provide expressly for retroactivity does not change the law.

{17} As we determined in Part II of this Opinion, the law subjects Producers, including Amoco, to the NGPT. The Ruling itself is interpretive in that it is consistent with and does not change Amoco's obligation under the existing law to pay the NGPT. The Ruling explains and clarifies what Amoco's obligation has always been. *See, e.g., Farmers Tel. Co. v. F.C.C.,* 184 F.3d 1241, 1249–50 (10th Cir.1999) (holding that the question of retroactivity does not arise when a ruling is merely interpretive; recognizing that an agency ruling is no more retroactive in its operations than is a judicial determination construing and applying a statute to a case at hand); *McCulloch Gas Processing Corp. v. Black Hills Oil Marketers, Inc.,* 564 F.2d 916, 919 (10th Cir.1977) (recognizing that

there is no retroactive aspect when there is merely an interpretation of a previously issued regulation, as opposed to the promulgation of a new regulation). For this reason, we hold that Amoco is subject to the Act, consistent with, but irrespective of and independent of, TRD's Ruling.

■ {18} Amoco also argues that because the processing of coal seam gas was a new situation for which TRD had not previously taken an affirmative position, and because Amoco in good faith believed that the transactions were not taxable, that Amoco should not be held liable for the NGPT. Regardless of whether Amoco acted in good faith in its mistaken belief, it nonetheless was responsible to pay the NGPT. *See, e.g.,* NMSA 1978, § 7–1–13 (1994) (stating that if the secretary or secretary's delegate determines that a taxpayer is liable for taxes that are due and that have not been previously assessed, the secretary or delegate shall promptly assess the amount thereof to the taxpayer). Unlike a situation wherein a ruling is inconsistent with case law, or when there has been detrimental reliance by a party, the Ruling at issue in this case is interpretive in that it merely explains or clarifies existing law, or what the existing rights and obligations have always been. *See e.g., Farmers Tel. Co.,* 184 F.3d at 1249–50; *McCulloch Gas Processing Corp.,* 564 F.2d at 919; *cf.* 3.1.2.8(B) NMAC (2000) ("[T]he department shall be estopped . . . from obtaining or withholding the relief requested if it is shown by the party adverse to the department that the party's action or inaction subject to dispute was in accordance with any ruling addressed to the party by the secretary, unless the ruling had been rendered invalid or had been superceded by regulation or by another ruling addressed to the party at the time the asserted liability for tax arose."); *Likins–Foster Honolulu Corp. v. Comm'r Internal Revenue Serv.,* 840 F.2d 642, 647 (9th Cir.1988) (recognizing that reliance on settled law or on a specific, favorable ruling constitutes evidence of a harsh result that would make retroactive application of a regulation an abuse of discretion); *Auto. Club of Mich. v. Comm'r of Internal Revenue,* 230 F.2d 585, 596 (6th Cir.1956) (limiting retroactive application when there has

168

been justifiable reliance by a party upon a prior agency position—such as when there has been reliance on a prior ruling issued directly to a taxpayer). In the present circumstances, there has been neither a change in position by TRD nor reliance by Amoco; therefore the law controls.

{19} To conclude, it is clear that the Ruling at issue is not afforded retroactive effect because it failed to expressly so provide pursuant to Section 9–11–6.2(H). Nevertheless, Amoco must still fulfill its obligations pursuant to the Act. Because the Ruling is afforded no retroactive effect, the law in place prior to the Ruling applies—in this case, that the removal of carbon dioxide from coal seam gas is processing and subject to the NGPT. The Ruling at issue does not contravene any prior rulings, is consistent with the applicable law, and is interpretive in that it merely explains existing law. We affirm.

### IV. Assessment of Interest and Penalty

{20} NMSA 1978, § 7–1–67(A) (2001), provides "[i]f a tax imposed is not paid on or before the day on which it becomes due, interest shall be paid to the state on that amount from the first day following the day on which the tax becomes due." Producers contend that TRD cannot collect interest on the owed NGPT. Producers argue that Section 7–1–67(A) is inapplicable because the Val Verde and Milagro plant operators failed to first remit their taxes due for processing. See § 7–33–8 (1970) ("Within twenty-five days following the end of each calendar month, each processor shall ... make a return to the commission showing the value, volume and kind of products sold from each plant for the calendar month [and][a]ll taxes due, or to be remitted, by the processor shall accompany this return.").

{21} We are not persuaded by Producers' arguments. Even assuming that the plant operators failed to timely fulfill their tax responsibilities, nothing in Sections 7–1–67(A) or 7–33–8 indicates that a plant operator's failure to timely remit monthly taxes absolves Producers of their NGPT obligations. For this reason, we hold that Producers are responsible for paying interest on the owed NGPT.

{22} Producers argue further that the penalties they paid to TRD should be refunded, along with interest on such penalties. NMSA 1978, § 7–1–69(A) (1992, amended 2001), provides a two-percent penalty per month for failure to pay taxes due to negligence. The unique circumstances of this case persuade us that Producers were not negligent in determining the applicability of the NGPT. At the time the applicable NGPT was enacted, coal seam gas was not processed. For this reason, the applicable pre–1998 NGPT does not directly address whether the removal of carbon dioxide from coal seam gas constitutes processing. It was not until late in 1988 that coal seam wells were drilled in the San Juan Basin, and not until late in 1990 that the Val Verde and Milagro plants were constructed to address the differences between coal seam and conventional gases.

{23} Additionally, it appears that TRD was unclear regarding the applicability of the NGPT. In April 1993, El Paso notified Producers and TRD that it was no longer reporting and remitting the NGPT. Although TRD subsequently visited the Milagro and Val Verde plants, it did not include these plants in the database system of plants subject to the NGPT. Prior to 1995, TRD had not assessed a NGPT against anyone in connection with coal seam gas. It was not until Amoco requested a ruling from TRD regarding whether a NGPT was due on coal seam gas that TRD took an affirmative position. As discussed in Part II, given the dramatic change in circumstances, whether or not the removal of carbon dioxide from coal seam gas is processing involves considerable legal analysis.

{24} Under the circumstances of this case, we hold that Producers were not negligent in failing to pay the NGPT, and that TRD accordingly must refund any penalty and interest on such penalty to Producers.

### CONCLUSION

{25} We hold that the removal of carbon dioxide from coal seam gas is processing and, therefore, Producers must pay the NGPT on their production of coal seam gas. We hold further that the fact that TRD's Ruling itself

does not have retroactive effect does not exonerate Producers for taxes due in the years 1991 through 1995. Producers must pay interest on the owed NGPT, but are not subject to any penalty or interest on such penalty.

{26} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Judge and CYNTHIA A. FRY, Judge.

## APPENDIX A

**(Taken from the replacement pamphlet 1990 for the time period between 1991 to 1995).**

### 7–33–1. Short title.

Chapter 7, Article 33 NMSA 1978 may be cited as the "Natural Gas Processors Tax Act".

### 7–33–2. Definitions.

As used in the Natural Gas Processors Tax Act [this article]:

A. "commission", "department", "division" or "oil and gas accounting division" means the taxation and revenue department, the secretary of taxation and revenue or any employee of the department exercising authority lawfully delegated to that employee by the secretary;

B. "processor" means a person who:

(1) processes natural gas or processes hydrocarbons incidental to the processing of natural gas; or

(2) extracts by-products from natural gas or other hydrocarbons incidental to the processing of natural gas, individually or any combination thereof. "Processor" does not mean a person who refines or processes oil, natural gas or liquid hydrocarbons or extracts by-products therefrom through a process which is commonly considered a field or lease operation, such as well-head separation, dehydration, purification, desulfurization, compression or trapping;

C. "product" means natural gas or liquid hydrocarbons, individually or any combination thereof, which has been processed by the processor or any by-product which has been derived therefrom by the processor. "Product" does not include distinct petrochemicals produced from hydrocarbons by chemical conversion in a petrochemical plant;

D. "value" means the actual price received for products by the processor at his plant; and

E. "person" means any individual, estate, trust, receiver, business trust, corporation, firm, copartnership, cooperative, joint venture, association or other group or combination acting as a unit.

### 7–33–3. Repealed.

### 7–33–4. Privilege tax levied; collected by oil and gas accounting division of the taxation and revenue department; rate.

A. There is levied and shall be collected by the oil and gas accounting division of the taxation and revenue department, a privilege tax on processors for the privilege of engaging in the business of processing based on the value of their products. The measure of the tax shall be forty-five one-hundredths of one percent of the value of the products.

B. This tax does not apply to the value of products:

(1) used for plant fuel by the processor;

(2) which are returned to the lease from which produced; or

(3) sold to:

(a) the government of the United States, its departments or agencies;

(b) the state of New Mexico or any of its political subdivisions; or

(c) nonprofit hospitals; religious or charitable organizations, when the products are used in the conduct of their regular functions.

C. Every interest owner is liable for this tax to the extent of his interest in the value of such products or to the extent of his interest as may be measured by the value of such products.

Any Indian tribe, Indian pueblo or Indian is liable for this tax to the extent authorized or permitted by law.

**7–33–5. Value may be determined by commission; standard.**

A. The commission may determine the value of products of a processor when:

(1) the processor and purchaser are affiliated persons;

(2) the processor and purchaser are not engaged in an arm's length transaction; or

(3) products are removed from a processor's plant and a value is not established.

B. Value, when determined by the commission, shall be commensurate with products of like quality, character or use, for which value is determinable.

**7–33–6. Price increase subject to approval of agency of United States of America, state of New Mexico or court; refund.**

When an increase in the value of any product is subject to the approval of any agency of the United States of America or the state of New Mexico or any court, the increased value is subject to this tax. In the event the increase in value is disapproved, either in whole or in part, then the amount of tax which has been paid on the disapproved part of the value shall be considered excess tax. Any person who has paid any such excess tax may apply for a refund of that excess tax in accordance with the provisions of Section 7–1–26 NMSA 1978.

**7–33–7. Products on which tax has been levied; regulation by commission.**

This tax shall not be levied more than once on the same product. Reporting of products on which this tax has been paid is subject to the regulation of the commission.

**7–33–8. Tax report; tax remittance; additional information.**

Within twenty-five days following the end of each calendar month, each processor shall, in the form and manner required by the commission, make a return to the commission showing the value, volume and kind of products sold from each plant for the calendar month. All taxes due, or to be remitted, by the processor shall accompany this return. Any additional report or information the commission may deem necessary for the proper administration of the Natural Gas Processors Tax Act [this article] may be required.

**7–33–9 to 7–33–22. Repealed.**