2007-NMCA-050

157 P.3d 85

**PUBLIC SERVICE COMPANY OF NEW MEXICO, a New Mexico corporation, Plaintiff–Appellant,**

v.

**NEW MEXICO TAXATION & REVENUE DEPARTMENT, a State Agency; and Jan Goodwin, as Secretary of the New Mexico Taxation & Revenue Department in her official capacity, Defendants–Appellees.**

No. 26,349.

Court of Appeals of New Mexico.

March 9, 2007.

Keleher & McLeod, P.A., Thomas C. Bird, Tracy J. Ahr, Anastasia S. Stevens, Margaret A. Foster, Albuquerque, NM, for Appellant.

Jeffrey W. Loubet, Special Assistant Attorney General, New Mexico Taxation and Revenue Department, Santa Fe, NM, for Appellees.

## OPINION

PICKARD, Judge.

{1} Plaintiff, Public Service Company of New Mexico (PNM), a public utility in the business of generating and selling electricity, appeals from a district court order granting summary judgment in favor of Defendants, New Mexico Taxation and Revenue Department (the Department). On appeal, PNM challenges the Department's denial of a refund for a compensating tax levied upon PNM's purchase of turbines and related equipment for use in a generating plant in the City of Lordsburg, New Mexico. Both parties agree that the dispositive issue on appeal is whether PNM's sale of the turbines and related equipment was in the "ordinary course of business." We conclude that PNM's sale of the turbines and related equipment was not in the ordinary course of business, and we therefore affirm the district court's grant of summary judgment in favor of the Department.

## BACKGROUND

{2} The material facts in this case are undisputed. PNM is a New Mexico corporation that sells electricity both within New Mexico and outside the state. In 2000, PNM purchased turbines and related equipment from GE Packaged Power, Inc. (GE) in Texas. The turbines and related equipment were to be used in the construction of a generating plant in Lordsburg, which was being financed by industrial revenue bonds. As part of this project, PNM planned to convey the plant site and equipment to Lordsburg, and Lordsburg would then lease the generating plant to PNM during the term of the bonds and eventually sell the plant back to PNM after full payment of the bonds.

{3} The turbines and related equipment were initially stored at a facility in Houston, Texas, and thereafter moved to Hobbs, New Mexico, prior to installation in the generating plant that was being constructed at a project site in Lordsburg. PNM reported and paid compensating tax in the amount of $1,522,294.61 on the value of the turbines and related equipment.

{4} PNM subsequently requested a ruling from the Department as to whether it was entitled to a refund with respect to the compensating tax paid. PNM initially claimed that it qualified as a purchasing agent for Lordsburg, which meant that the purchase of the turbines and related equipment would be treated as though it was purchased by Lordsburg for tax purposes, and PNM would therefore be entitled to a refund of the compensating tax paid. *See* NMSA 1978, § 7–9–54 (2003) (providing for a deduction from gross receipts for sale of tangible personal property, other than construction materials, to a government agency); 3.2.212.22(B) NMAC (2001) ("Receipts from the sale of tangible personal property to the private person who is acting as agent for the government with respect to the bond project are deductible under Section 7–9–54 NMSA 1978 if the tangible personal property is not an ingredient or component part of a construction project."). PNM withdrew its request for a ruling and filed a formal claim for a refund after the Department issued a preliminary determination contrary to PNM's position. The Department denied PNM's claim, and PNM filed suit.

{5} Prior to commencing this action against the Department, PNM filed a second claim for refund on the grounds that the transaction involving the turbines and related equipment was not subject to the compensating tax imposed by NMSA 1978, § 7–9–7 (1995), because the equipment was not acquired within the meaning of that statutory provision. The Department did not act on this second claim for refund and instead consented to PNM's incorporation of this claim within an amended complaint in its pending suit before the district court.

{6} Before the district court, both parties agreed that the dispositive issue as to PNM's entitlement to a refund was the definition of "ordinary course of business" within the Gross Receipts and Compensating Tax Act, NMSA 1978, §§ 7–9–1 to –100 (1966, as amended through 2006). Specifically, if PNM's resale of the turbines and related equipment was considered a sale in the ordinary course of business, PNM would be entitled to a refund of the compensating tax paid. On the other hand, if the sale was considered outside PNM's ordinary course of business, PNM would not be entitled to a refund of the compensating tax paid.

{7} Both parties filed motions for summary judgment. In its motion, PNM argued that it was entitled to summary judgment and a refund of the compensating tax paid because it resold the turbines and related equipment in the ordinary course of business. Alternatively, PNM argued that even if the definition of ordinary course was construed against it, the Department was statutorily estopped from denying a refund. The Department countered that it was entitled to summary judgment because PNM did not sell the turbines and related equipment in the ordinary course of business because the sale was highly unusual and not routine. Both parties stipulated to the fact that PNM had not previously bought and sold turbines and has not done so since the transaction at issue.

{8} The district court granted summary judgment in favor of the Department, finding that no material facts were in dispute and that PNM's purchase and resale of the turbines and related equipment were not in the ordinary course of business. Additionally, the district court found that none of the Department rulings or regulations cited by PNM supported a claim of estoppel by PNM. PNM appeals.

## DISCUSSION

{9} PNM raises three issues on appeal: (1) whether the district court erred in concluding that "ordinary course of business" covers only those transactions by a business that are usual and routine; (2) whether the district court erred as a matter of law in determining that the Department was not estopped, based on previous Department regulations, from imposing a compensating tax on PNM; and (3) whether the district court erred in concluding that as a matter of law, the Department was not bound by the policy reflected in prior regulations and rulings interpreting the statutes incorporating the ordinary course of business standard. After briefly addressing the applicable standard of review and then discussing the relevant statutory provisions, we will analyze each of PNM's asserted errors in turn.

### Standard of Review

{10} "The standard of review for a motion for summary judgment is whether there are any genuine issues of material fact and whether the moving party is entitled to summary judgment as a matter of law." *Williams v. Cent. Consol. Sch. Dist.*, 1998–NMCA–006, ¶ 7, 124 N.M. 488, 952 P.2d 978; *see also Johnson v. Yates Petroleum Corp.*, 1999–NMCA–066, ¶ 3, 127 N.M. 355, 981 P.2d 288 ("Summary judgment is the appropriate remedy if the facts are undisputed and it is only the legal interpretation of the facts that remains."). Where, as here, there are no genuine issues of material fact, we "conduct a de novo review of the district court's ruling to ascertain whether summary judgment was properly granted." *Wiste v. Neff & Co.*, 1998–NMCA–165, ¶ 6, 126 N.M. 232, 967 P.2d 1172.

### Pertinent Tax Code Provisions

{11} At issue in the present case is the application of the State's "compensating tax," which is a tax "designed to subject out-of-state sellers of goods that are used in New

Mexico to a tax similar to the [gross receipts tax]." *Kmart Corp. v. N.M. Taxation & Revenue Dep't,* 2006–NMSC–006, ¶ 19, 139 N.M. 172, 131 P.3d 22; *see also Siemens Energy & Automation, Inc. v. N.M. Taxation & Revenue Dep't,* 119 N.M. 316, 322, 889 P.2d 1238, 1244 (Ct.App.1994) (stating that "[c]ompensating tax is paid by a New Mexico purchaser only if the sales occurred outside of New Mexico," whereas "[g]ross receipts tax is due from the seller on its receipts from the sales only if the sales occurred inside New Mexico"). New Mexico's compensating tax, as described in Section 7–9–7 of the Gross Receipts and Compensating Tax Act, "is imposed on the buyer where property or services were acquired as the result of a transaction which was not initially subject to the gross receipts tax, but because of the buyer's subsequent use of such property or services, should have been subject to the gross receipts tax." *Continental Inn v. N.M. Taxation & Revenue Dep't,* 113 N.M. 588, 589–90, 829 P.2d 946, 947–48 (Ct.App. 1992). Specifically, Section 7–9–7 provides that

> A. For the privilege of using tangible property in New Mexico, there is imposed on the person using the property an excise tax equal to five percent of the value of tangible property that was:
>
> > (1) manufactured by the person using the property in the state;
> >
> > (2) acquired outside this state as the result of a transaction that would have been subject to the gross receipts tax had it occurred within this state; or
> >
> > (3) acquired as the result of a transaction which was not initially subject to the compensating tax imposed by Paragraph (2) of this subsection or the gross receipts tax but which transaction, because of the buyer's subsequent use of the property, should have been subject to the compensating tax imposed by Paragraph (2) of this subsection or the gross receipts tax.

{12} At issue in the present case is whether PNM's purchase and resale of turbines and related equipment is within the purview of Section 7–9–7. PNM argues that the compensating tax imposed in this case was inappropriate for two reasons. First, PNM argues that it did not "use" the turbines and related equipment as contemplated by Section 7–9–7(A). Section 7–9–7(A) provides that in order for a compensating tax to be imposed, the tangible personal property at issue must be used by the taxpayer. "Use" or "using," as defined in the Act, "includes use, consumption or storage other than storage for subsequent sale in the ordinary course of business or for use solely outside this state." Section 7–9–3(N). PNM argues that its importation of the turbines and related equipment into New Mexico, and subsequent storage in Hobbs, constituted "storage for subsequent sale in the ordinary course of business" and the equipment was therefore not "used" as required by the Act.

{13} Second, PNM contends that even if the property was "used" as defined in the Act, the transaction resulting in PNM's purchase of the turbines and related equipment would not have been subject to the gross receipts tax had it occurred within New Mexico; therefore, the transaction does not fall under Section 7–9–7(A)(2), which is the relevant subsection under which the compensating tax was imposed. PNM argues that although a gross receipts tax technically would have been applied to GE's sale of the turbines and related equipment, the sale falls under an exception within the Act and thus GE would not have paid a gross receipts tax on the sale. More specifically, PNM argues that the deduction enumerated in Section 7–9–47 is applicable to the sale from GE to PNM. Section 7–9–47 provides that

> [r]eceipts from selling tangible personal property or licenses may be deducted from gross receipts or from governmental gross receipts if the sale is made to a person who delivers a nontaxable transaction certificate to the seller. The buyer delivering the nontaxable transaction certificate must resell the tangible personal property or license either by itself or in combination with other tangible personal property or licenses in the ordinary course of business.

PNM contends that if the sale involving the turbines and related equipment happened within the state, PNM, as a buyer planning to resell the property in the ordinary course

of business, would have delivered a nontaxable transaction certificate (NTTC) to the seller, GE, who would then be able to deduct the proceeds of the sale from its gross receipts. Thus, according to PNM, the sale would not have been subject to gross receipts tax in New Mexico and therefore does not fall under Section 7–9–7. *See, e.g., Vivigen, Inc. v. Minzner*, 117 N.M. 224, 226 n. 1, 870 P.2d 1382, 1384 n. 1 (Ct.App.1994) (stating that a deduction from gross receipts tax also provides a deduction from compensating tax).

{14} As indicated by both of PNM's arguments, and agreed on by both parties, the central question in this appeal is whether PNM's subsequent sale of the turbines and related equipment was a sale in the ordinary course of business. The phrase "ordinary course of business" is not defined within the Act and its meaning within the context of the Act has not yet been construed by our courts. Below, the district court construed the phrase as meaning the "routine activities of the business." Although we do not construe the phrase as narrowly as the district court, we nevertheless conclude that PNM's resale of the turbines and related equipment was not in the ordinary course of business.

**Sale in the Ordinary Course of Business**

{15} Although we have not previously addressed the meaning of the phase, "ordinary course of business" within the context of New Mexico's compensating tax, its meaning has been examined in other contexts. Accordingly, we will examine these other contexts and endeavor to define the phrase, giving effect to the relevant statutory provisions as written, and attributing to the words their plain meaning. *See Waksman v. City of Albuquerque*, 102 N.M. 41, 43, 690 P.2d 1035, 1037 (1984); *Amoco Prod. Co. v. N.M. Taxation & Revenue Dep't*, 2003–NMCA–092, ¶ 12, 134 N.M. 162, 74 P.3d 96.

{16} In *Wilson v. Massachusetts Mutual Life Insurance Co.*, 2004–NMCA–051, 135 N.M. 506, 90 P.3d 525, we examined the meaning of "course of business," as used in the New Mexico Uniform Unclaimed Property Act, NMSA 1978, §§ 7–8A–1 to –31 (1997, as amended through 2006). In concluding that the defendant's issuance of certificates

as part of a settlement agreement was not in the regular course of business, we held that "course of business" means a "business practice that is routine, regular, usual, or normally done." *Wilson*, 2004–NMCA–051, ¶ 32, 135 N.M. 506, 90 P.3d 525. We observed that the defendant was in the business of selling insurance and other financial products and that the certificates were not part of the defendant's regular line of products, nor were such certificates routinely issued by the defendant. *Id.* As such, we held that the issuance of the certificates was not in the course of the defendant's business. *Id.*

{17} Applying *Wilson's* definition of "course of business" to the case at bar, we cannot conclude that PNM's purchase and resale of the turbines and related equipment were in the ordinary course of PNM's business. PNM has never purchased turbines previously, nor is there any evidence in the record to suggest that PNM plans to engage in related purchases and sales in the future. Moreover, there is no indication in the record that PNM had previously constructed generating plants. This transaction was essentially a brand new business venture for PNM. Thus, the transaction at issue does not appear to be "business practice that is routine, regular, usual, or normally done." *Id.*

{18} The phrase "ordinary course of business" has also been examined in the context of bankruptcy proceedings. Under the Bankruptcy Code, a trustee may sell estate property in the ordinary course of business without notice and a hearing. 11 U.S.C. § 363(c)(1) (2000). Additionally, the Code prevents a trustee from avoiding a debtor's payment of a debt that was incurred in the ordinary course of business. 11 U.S.C. § 547(c)(2) (2000). In the bankruptcy context, a transaction is in the ordinary course of business if the "transaction is of a type that other similar businesses would engage in as ordinary business" and if the transaction does not subject "a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *In re Springfield Contracting Corp.*, 154 B.R. 214, 226 (Bankr.E.D.Va.1993) (mem.). Further, a transaction is considered in the ordinary course of business "when there is a showing

that the transaction is the sort occurring in the day-to-day operation of the debtor's business." *Id.*

{19} We disagree with PNM's assertion that bankruptcy cases construing the meaning of ordinary course of business support its claim that the sale of the turbines and related equipment was in the ordinary course of business. PNM has not presented any evidence to suggest that its transaction was typical or customary within its industry. Further, PNM readily admits that the transaction was the first of its kind and thus the sale cannot be considered a transaction that occurs in the day-to-day operation of its business. Lastly, the fact that PNM had not previously engaged in the business of the construction of new generating plants suggests that the transaction created new economic risks for PNM. Thus, we conclude that under the Bankruptcy Code, PNM's purchase and resale of the turbines and related equipment would not be considered in the ordinary course of business.

{20} Interpretations of "course of business" in other contexts present a much closer question for this Court. Under the Uniform Division of Income for Tax Purposes Act (UDITPA), NMSA 1978, §§ 7–4–1 to –21 (1965, as amended through 2002), "income arising from transactions and activity in the regular course of the taxpayer's trade or business" is considered "business income" under the Act. Section 7–4–2(A). PNM argues that cases construing the meaning of "regular course of the taxpayer's trade or business" under the UDITPA support its claim that the one-time purchase and sale of turbines and related equipment was in the ordinary course of PNM's business. While we agree that the cases cited by PNM construe the phrase "course of business" more broadly than the district court, we nevertheless conclude that these cases do not support PNM's claim.

{21} In the first New Mexico case to examine the phrase under the UDITPA, our Court examined a number of different transactions entered into by a company that specialized in the manufacture and sale of wood products. *See Champion Int'l Corp. v. Bureau of Revenue*, 88 N.M. 411, 412, 540 P.2d 1300, 1301 (Ct.App.1975). The lead opinion, written by Judge Sutin, held that the phrase "regular course of the taxpayer's trade or business" encompassed "[b]usiness deals and the performance of a specific function in the normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business." *Id.* at 414, 540 P.2d at 1303 (internal quotation marks and citation omitted). Based on this definition, Judge Sutin concluded that the interest income earned by the company in short term investments constituted business income because "a normal and customary practice by Champion was to invest excess capital, not needed for business purposes, in short-term securities." *Id.* Although ostensibly not related to the manufacture or sale of wood products, the investments were transactions routinely entered into by the company. *Id.* Similarly, Judge Sutin concluded that the company's rents from the rental of excess office space constituted business income because the rentals were customary and regularly done by the company. *Id.* at 415, 540 P.2d at 1304. Finally, Judge Sutin held that the sale of logs by the company was also business income because, like the investments and rents, "[t]he sale of logs was a normal, customary procedure in the business of Champion" and had been so for several years. *Id.*

{22} Judge Wood specially concurred in *Champion. See id.* at 417–18, 540 P.2d at 1306–07 (Wood, C.J., specially concurring). In his concurrence, Judge Wood stated the phrase "regular course of [the taxpayer's] *trade or business*" was not limited to the main course of a company's business. *Id.* at 417, 540 P.2d at 1306. Thus, the company's claim that it was not in the business of investing, renting property, or making occasional sales of logs, but instead in the business of "manufacturing and selling finished [wood] products," did not carry any weight with Judge Wood. *Id.* (internal quotation marks omitted). Rather, Judge Wood argued that it made "no difference whether the income derives from the main business, the principal business, the occasional business or the subordinate business so long as the income arises from the 'regular course' of business." *Id.* Judge Wood further concluded

that the pertinent factors in deciding whether a transaction is in the regular course of business were the "the nature of the particular transaction," "former practices of the business entity," and how the income was used. *Id.* at 418, 540 P.2d at 1307 (internal quotation marks and citation omitted).

{23} Likewise, Judge Lopez specially concurred in the *Champion* opinion. *See id.* at 418–19, 540 P.2d at 1307–08 (Lopez, J., specially concurring). "Judge Lopez's approach was to look to whether the income in question was 'independent' of a taxpayer's business, relying on the case law addressing the unitary business concept to determine if the income is sufficiently 'independent' to be nonbusiness income." *Kewanee Indus., Inc. v. Reese,* 114 N.M. 784, 788, 845 P.2d 1238, 1242 (1993) (citing *Champion Int'l Corp.,* 88 N.M. at 418, 540 P.2d at 1307). As an example of this approach, Judge Lopez described a hypothetical proffered by the Bureau of Revenue's counsel in response to a question regarding what constituted nonbusiness income: " 'Well, if you took that money out and invested in yachts for an unrelated purpose or bought property not related to your business of logging or whatever it is and you derived income from it, then it would be nonbusiness income.' " *Champion Int'l Corp.,* 88 N.M. at 419, 540 P.2d at 1308. Thus, according to Judge Lopez, "the relationship of the income source to the business activities of the taxpayer determined whether income was business in nature. If the source were independent of these activities, the income was nonbusiness." *Tipperary Corp. v. N.M. Bureau of Revenue,* 93 N.M. 22, 25, 595 P.2d 1212, 1215 (Ct.App.1979).

{24} Approximately four years later, our Court once again addressed the meaning of the phrase " 'regular course of the taxpayer's trade or business.' " *See id.* In *Tipperary Corp.,* a company engaged in the "business of exploring, developing and processing oil and gas" argued that the purchase and subsequent sale of coal leases was not taxable income because the company was not engaged in the business of coal leases. *Id.* at 24–25, 595 P.2d at 1214–15. To determine whether Tipperary's transactions were in the regular course of its business, this Court analyzed the transactions under each of the approaches discussed in *Champion. See Tipperary Corp.,* 93 N.M. at 27–28, 595 P.2d at 1217–18. Under each approach, our Court concluded that Tipperary's sale of coal leases was in the regular course of its business:

> Although there is evidence that [Tipperary] had never sold coal leases prior to the Mobil sale, there is substantial evidence to support the conclusions that [Tipperary] is in the business of exploring and developing oil, gas and mineral properties and that it is customary for [Tipperary] to dispose of its property interests through transactions similar to the Mobil sale. In addition, the fact that [Tipperary] is in the business of exploring and developing oil, gas and mineral properties and Judge Wood's rejection of a narrow meaning of trade or business further supports the conclusion that the lease sale was an accustomed procedure in [Tipperary]'s business. Furthermore, the evidence is substantial that the monies from the Transco option agreement and Mobil sale were used for [Tipperary]'s general operating needs. Thus, the use test for business income has been met.

*Id.* at 28, 595 P.2d at 1218. This Court further concluded that the coal leases were not independent from Tipperary's general business as "the management and maintenance of the coal leases were interrelated with [Tipperary]'s general endeavors and these endeavors were, in turn, benefitted by the revenues generated from the coal acreage." *Id.* at 29, 595 P.2d at 1219.

{25} More recently, in *Kewanee Industries, Inc.,* an oil and gas company bought coal draglines from another company and then leased the draglines back to the same company. 114 N.M. at 786, 845 P.2d at 1240. The company argued that the income from the lease of the draglines did not constitute business income because the leases were not part of the company's regular course of business. *Id.* at 789, 845 P.2d at 1243. The Court disagreed, holding that the company's income from the leases "was business income because the leases generated substantial capital for Kewanee's general business purposes, and the leases were ongoing, recurring transactions constituting a regular or customary

portion of Kewanee's overall business." *Id.* at 790, 845 P.2d at 1244. In coming to this conclusion, the Court examined the purpose of the transactions, the use of the income earned from the transactions, and whether such a transaction was typical or customary for business entities. *Id.* at 789, 845 P.2d at 1243.

{26} In the present case, PNM admits that it has not previously purchased turbines and related equipment, nor does it plan to in the future. Moreover, there is no indication in the record that PNM has ever constructed a generating plant; rather, PNM's typical business practices include owning, operating, leasing, and controlling generating plants and facilities for the "generation, transmission and distribution of electricity to the public at retail." NMSA 1978, § 62–3–3(G)(1) (2005) (defining "public utility"). Indeed, PNM states in its brief-in-chief that, with the purchase and sale of the turbines and related equipment, it "was for the first time developing a facility dedicated to generating electricity for the wholesale market." However, PNM argues that as a publicly held company, it will "in the ordinary course of business, expand, discontinue or modify its business activities in order to increase its overall profitability and please its shareholders." According to PNM, such activities include the transaction at issue in the present case, which under *Champion, Tipperary,* and *Kewanee,* must be considered in the ordinary course of PNM's business. We disagree.

{27} Applying the analyses described in *Champion, Tipperary,* and *Kewanee,* we are not convinced that PNM's purchase and sale of the turbines and related equipment was in the ordinary course of business. For one, PNM's activities with respect to the turbines and related equipment cannot be considered "[b]usiness deals and the performance of a specific function in the normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business." *Champion Int'l Corp.,* 88 N.M. at 414, 540 P.2d at 1303 (internal quotation marks and citation omitted). As previously mentioned, PNM has never purchased such items before, nor has it engaged in the construction of a generating plant. While we agree with PNM that

this is not a dispositive factor, we do consider the frequency of the transaction at issue to be a relevant consideration. *See Kewanee Indus., Inc.,* 114 N.M. at 790, 845 P.2d at 1244 (concluding that the lease of coal draglines was in the ordinary course of business in part because "the leases were ongoing, recurring transactions constituting a regular or customary portion of Kewanee's overall business"); *Champion Int'l Corp.,* 88 N.M. at 415, 540 P.2d at 1304 ("The sale of logs was a normal, customary procedure in the business of Champion for the year 1972 and had been for several years."). Moreover, PNM has not presented any evidence to suggest that it is typical or customary for other public utilities to construct such facilities. *See Kewanee Indus., Inc.,* 114 N.M. at 789, 845 P.2d at 1243 ("Applying the transactional test, the evidence also supports the conclusion that the acquisition of tax benefits is normal, typical, and customary procedure of many business entities.").

{28} Further, an examination of the nature of the transaction and the prior activities of PNM reveals that it was a new type of undertaking for PNM. *See Champion Int'l Corp.,* 88 N.M. at 418, 540 P.2d at 1307 (Wood, C.J., specially concurring) ("Pertinent in determining whether income arises from transactions in the regular course of business is 'the nature of the particular transaction' and 'former practices' of the business entity." (citation omitted)). PNM concedes that this was the first transaction of its kind entered into by PNM. Although PNM argues that it has entered into a variety of financing opportunities in the past, we note that PNM also admits that the resale portion of the transaction at issue was structured differently from previous generating plant projects. Moreover, there is no indication in the record that PNM intends to enter into similar transactions in the future. Thus, while we agree with PNM that it does not have to be in the business of constructing power plants for its sale of turbines and related equipment to be in the ordinary course of its business, we nevertheless believe that PNM's actions must be considered "normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business" in order to be considered within the ordinary course of

PNM's business. *Id.* at 414, 540 P.2d at 1303 (internal quotation marks and citation omitted).

{29} PNM argues that it has previously bought and resold tangible personal property that was considered nontaxable by the Department because it was considered sold in PNM's ordinary course of business. These purchases included electrical and plumbing supplies, equipment, and building materials. However, PNM does not explain the nature of these purchases, the frequency of such purchases, or how such purchases relate to its business. Moreover, the fact that PNM has purchased and sold tangible personal property in the past does not necessarily mean that the transaction at issue was in the ordinary course of business. If it did, any sale of tangible personal property by a company would be considered in the ordinary course of business, provided that the company had sold tangible personal property in the past. We therefore do not believe that, under the facts of the case at bar, PNM's previous sales of tangible personal property have any bearing on whether the transaction at issue is a sale in the ordinary course of business.

{30} Examining the transaction at issue under the test described by Judge Lopez in his special concurrence in *Champion* presents a closer question. *See id.* at 418–19, 540 P.2d at 1307–08 (Lopez, J., specially concurring). We note that a transaction relating to the construction of a generating plant is not wholly unrelated to PNM's business of generating and selling electricity. Thus, although PNM has not previously engaged in the construction of a generating plant, we cannot say that it is something completely divorced from what PNM does on a regular basis. That being said, however, we are not convinced that the fact that a transaction is related to what a company does regularly is dispositive of the issue of whether the transaction occurred in the ordinary course of business. Rather, the transaction still must be "normal, typical, customary or accustomed policy or procedure of the taxpayer's trade or business." *Id.* at 414, 540 P.2d at 1303 (internal quotation marks and citation omitted); *see also Ind. Bell Tel. Co. v. Ind. Dep't of*

*State Revenue,* 627 N.E.2d 1386, 1388 (Ind. Tax Ct.1994) ("A sale in the ordinary course of business is not an isolated, nonrecurring sale.").

{31} We note that the purpose of the UDITPA statutory scheme in "providing uniform division for income tax purposes of the income of a multistate business," *Champion Int'l Corp.,* 88 N.M. at 412, 540 P.2d at 1302, differs from the purposes of the Gross Receipts and Compensating Tax Act. Although we analyze this case under the framework of the line of cases interpreting UDITPA, we by no means wish to suggest that PNM's activities in this case would not be subject to business income tax under the UDITPA statutory scheme even though we hold that they are not activities in the ordinary course of business under the Gross Receipts Act.

{32} Our conclusion that PNM's sale of the turbines and related equipment was not in the ordinary course of business is further supported by a number of policy considerations. "There is a presumption that receipts of a person engaging in business are subject to the gross receipts tax." *Kewanee Indus., Inc.,* 114 N.M. at 791, 845 P.2d at 1245. Under this presumption, the party claiming entitlement to an exemption or deduction from the gross receipts tax bears the burden of clearly overcoming this presumption. *Id.* "The exemption 'must be clearly and unambiguously expressed in the statute, and must be clearly established by the taxpayer claiming the right thereto.'" *Id.* (quoting *Chavez v. Comm'r of Revenue,* 82 N.M. 97, 99, 476 P.2d 67, 69 (Ct.App.1970)). Moreover, the statute will be "construed strictly in favor of the taxing authority." *Id.* Although PNM makes a number of persuasive arguments in favor of its position, we do not believe that it has clearly demonstrated its entitlement to a refund of compensating tax paid.

{33} In contrast to the narrow construction given to a statutory deduction, there is a presumption in favor of taxation and therefore statutes such as UDITPA are construed to effectuate such a presumption. *See* NMSA 1978, § 7–1–17(C) (1992) ("Any assessment of taxes or demand for payment made by the department is presumed to be

correct."). UDITPA is "a widely-used, uniform system of apportioning and allocating the income of taxpayers who operate in multiple states." *Kmart Props., Inc. v. Taxation & Revenue Dep't*, 2006–NMCA–026, ¶ 46, 139 N.M. 177, 131 P.3d 27, *rev'd on other grounds*, 2006–NMSC–006, 139 N.M. 172, 131 P.3d 22. Under UDITPA, corporate income is apportioned based on a formula that seeks to "fairly represent the extent of the taxpayer's business activity in this state." *Id.* ¶¶ 46–48 (internal quotation marks and citation omitted); *see also* § 7–4–19 (allowing a taxpayer or the Department to adjust the apportionment formula where the formula does not "fairly represent the extent of the taxpayer's business activity in this state"). Thus, cases such as *Champion, Tipperary,* and *Kewanee,* must necessarily construe the provisions of UDITPA under the presumption that the imposition of taxes was correct and that, to the extent that the taxpayers were doing business within the state, a fair tax should be imposed. *See also Nakashima v. State Farm Co.*, 2007–NMCA–027, ¶ 30, 141 N.M. 239, 153 P.3d 664, cert. denied 2007–NMCERT–03, 141 N.M. 401, 156 P.3d 39 (indicating that definitions contained in taxing provisions have a broad application because the purpose of those provisions is to exact payments). Conversely, the deduction sought by PNM is not construed with the presumption that it is applicable, but rather, as a narrow exception to the general rule in favor of taxation. *See Kewanee Indus., Inc.*, 114 N.M. at 791, 845 P.2d at 1245.

■ {34} Moreover, the purpose of deductions or exemptions for sales for resale in the ordinary course of business is to prevent double taxation. *See, e.g., Nev. Tax Comm'n v. Nev. Cement Co.*, 117 Nev. 960, 36 P.3d 418, 420 (2001) (per curiam); *USA Waste Servs. of Houston, Inc. v. Strayhorn,* 150 S.W.3d 491, 495 (Tex.Ct.App.2004). PNM has not shown that the tax herein will be paid by someone else or at another time, and therefore does not raise the specter of double taxation. Rather, PNM appears to be attempting to avoid taxation entirely on this transaction.

{35} Additionally, we note that PNM's proffered construction of the phrase "ordinary course of business" would render the phrase meaningless within the context of the statute. We do not agree that any transaction entered into by a company with the intention of making money for its shareholders is necessarily in the ordinary course of that company's business. Rather, we believe that the phrase "ordinary course of business" contemplates some evidence that the transaction at issue is customary, normal, or regular within the company's own business or within the relevant industry at large. In the present case, we are not convinced that PNM made such a showing.

{36} In light of these considerations, we conclude that PNM has not clearly established that it is entitled to refund for the compensating tax paid in connection with PNM's purchase and resale of turbines and related equipment. For these same reasons, we conclude that to the extent that PNM argues that holding that its sale of turbines and related equipment was not in the ordinary course of business will thwart the purpose behind the Industrial Revenue Bond Act, NMSA 1978, §§ 3–32–1 to –16 (1965, as amended through 2005), such an issue is best addressed by the legislature. *See TPL, Inc. v. N.M. Taxation & Revenue Dep't,* 2003–NMSC–007, ¶ 40, 133 N.M. 447, 64 P.3d 474 (Minzner, J., dissenting) ("It is not this Court's place to allow for the exemption when the statute does not, even if the policies behind the statute may be furthered by doing so."). We therefore agree with the district court's conclusion that PNM's sale of the turbines and related equipment was not in the ordinary course of business.

**Estoppel**

■ {37} PNM next argues that even if the transaction at issue is not within the ordinary course of business, the Department is estopped under NMSA 1978, § 7–1–60 (1993) from denying a compensating tax refund to PNM. Section 7–1–60 provides that the Department is estopped from taking action against a party who acted "in accordance with any regulation effective during the time the asserted liability for the tax arose or in accordance with any ruling addressed to the party personally and in writing by the secre-

tary." PNM argues that it acted in accordance with a Department regulation, 3.2.205.17(A) NMAC (2001), in determining whether its transaction was subject to a compensating tax. We disagree with PNM's contention that estoppel is applicable in the present case.

{38} PNM claims that it relied on a regulation that describes a sale of tangible personal property to an electric cooperative association. *See* 3.2.205.17(A) NMAC. The pertinent regulation states:

A. Receipts from selling tangible personal property to an electric cooperative association which later sells the property to a person engaged in the construction business for incorporation into the construction project are receipts from selling tangible personal property for resale and may be deducted from gross receipts if the electric cooperative association delivers a nontaxable transaction certificate ( [NTTC] ) to the seller pursuant to Section 7–9–47 NMSA 1978.

B. If the electric co-operative association delivering the [NTTC] does not resell the tangible personal property in the ordinary course of business, the compensating tax is due.

3.2.205.17 NMAC. PNM argues that its transaction is analogous to the scenario described in 3.2.205.17(A) NMAC and therefore, that PNM should be entitled to a refund. We disagree.

{39} While 3.2.205.17(A) NMAC presents a similar factual scenario to the case at bar, the regulation in no way suggests that the electric cooperative association's actions are in the regular course of its business. Subsection A of 3.2.205.17 presents a scenario in which an electric cooperative association may issue NTTCs in connection with its purchase and resale of tangible personal property. Because the cooperative will issue the NTTC to the seller of the tangible personal property at the time of purchase or shortly thereafter, it is not yet apparent whether the cooperative will actually resell the property, or if it resells the property, whether the sale will be in the ordinary course of business. *Cf. Gas Co. of N.M. v. O'Cheskey*, 94 N.M. 630, 632, 614 P.2d 547, 549 (Ct.App.1980) ("The

issuance of a [NTTC] does not operate to transform an otherwise taxable transaction into a nontaxable transaction. It represents a statement by the purchaser of goods that its use is such that the seller is entitled to a *deduction* from its taxable receipts." (emphasis added)). Subsection B makes it clear that the electric cooperative association must eventually resell the tangible personal property in its ordinary course of business and that if the sale is not in the ordinary course of business, a tax will be due. *See* 3.2.10.9(A) NMAC (2001) ("When a person has delivered a nontaxable transaction certificate for a taxable purpose but then uses the service or tangible personal property in a manner other than indicated on the nontaxable transaction certificate, then the person who delivered the nontaxable transaction certificate is liable for the compensating tax on the value of the service or the tangible personal property."). To interpret this regulation in any other manner would make Subsection B superfluous. *See Regents of Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998–NMSC–020, ¶ 28, 125 N.M. 401, 962 P.2d 1236 ("Statutes must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)). We therefore conclude that PNM's reliance on 3.2.205.17 NMAC is misplaced and the Department is not estopped under Section 7–1–60 from denying a compensating tax refund to PNM.

**Administrative Gloss**

■ {40} Relying on *High Ridge Hinkle Joint Venture v. City of Albuquerque* (*Hinkle* ), 1998–NMSC–050, 126 N.M. 413, 970 P.2d 599, and *Smith v. Board of County Commissioners*, 2005–NMSC–012, 137 N.M. 280, 110 P.3d 496, PNM argues that the Department has impermissibly changed its position with respect to Section 7–9–47. PNM argues that three different Department rulings demonstrate that the Department has a longstanding policy with respect to the term "ordinary course of business." PNM contends that the Department did not follow this longstanding policy with respect to PNM's purchase and resale of the turbines and related equipment. As such, PNM ar-

gues that the Department should be compelled to follow its previous policy and refund PNM's payment of compensating tax. We conclude that PNM has not demonstrated that the Department has a longstanding policy with respect to the phrase "ordinary course of business."

■ {41} In construing statutes and regulations, courts will "give persuasive weight to long-standing administrative constructions of statutes by the agency charged with administering them." *Hinkle*, 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citation omitted); *see also Smith*, 2005–NMSC–012, ¶ 18, 137 N.M. 280, 110 P.3d 496. Such longstanding constructions, also known as "administrative glosses," constitute de facto agency policies that cannot be changed non-legislatively. *See Smith*, 2005–NMSC–012, ¶ 32, 137 N.M. 280, 110 P.3d 496; *Hinkle*, 1998–NMSC–050, ¶ 9, 126 N.M. 413, 970 P.2d 599.

{42} In order to demonstrate that such a policy exists in the present case, PNM must present evidence that the Department has previously and consistently construed the phrase "ordinary course of business" in a manner different than in the case at bar. Although none of the three rulings relied upon by PNM squarely addresses the definition of the phrase "ordinary course of business," we will nonetheless examine each in search of a longstanding Department policy.

{43} PNM first relies on Department Ruling 405–04–2 (2004) to argue that the Department has not traditionally applied such a strict construction of "ordinary course of business." In this ruling, a company operating a "water collection, production and treatment system and a wastewater treatment and reclamation facility" for a municipality asked the Department for a ruling on whether it could issue NTTCs for purchases of various materials and services used in connection with its water systems. The Department concluded that the company could issue NTTCs for those materials and services that it purchased for resale. Thus, for example, the company could purchase "water system repair and maintenance services and parts" and such transactions would be nontaxable,

as such items were being resold to the municipality at the end of the contract term.

{44} PNM argues that Ruling 405–04–2 demonstrates that the Department will consider a sale in the ordinary course of business where such sales are contemplated by contract. Moreover, PNM argues that this ruling demonstrates that the Department does not inquire into a company's main line of business or whether sales of tangible property are routinely made before concluding that a sale is in the ordinary course of business. We disagree.

{45} Initially we note that the ruling does not address the issue of "ordinary course of business"; thus, we can only assume that it was not an issue on which the company requested a ruling or that it was an issue agreed on by the Department and the company. Moreover, the central issue in the ruling was whether the tangible personal property purchased by the company was actually to be consumed by the company in the course of its provision of services to the municipality or whether the company was actually selling the property to the municipality. *See* 3.2.205.10(A)(1) NMAC (2001) ("When a taxpayer uses tangible personal property in the performance of a service, the tangible personal property is acquired for use and not for sale in the ordinary course of business. Therefore, a nontaxable transaction certificate may not be executed under Section 7–9–47 NMSA 1978 to acquire the tangible personal property."). Thus, the taxability of the various transactions at issue clearly hinged on whether the company was actually selling tangible personal property and not whether the company was selling the property in the ordinary course of business. We therefore cannot conclude that this ruling provides an administrative gloss on the phrase "ordinary course of business."

{46} Likewise, we consider PNM's reliance on Department Ruling 430–00–4 (2000) equally misplaced. Ruling 430–00–4 involves a company that had contracted with the Department of Energy (DOE) to operate a training facility in the State. The company was required, by contract, to provide accommodations for those students attending training at the facility. The company asked the

Department for a ruling on whether it could issue NTTCs in connection with its purchase of hotel rooms when the DOE's facilities were not available. The Department concluded that the company could issue NTTCs, as it was purchasing a license to use hotel rooms and reselling that license to the DOE.

{47} PNM argues that this ruling demonstrates that the Department has not always imposed a strict standard for what constitutes a sale in the ordinary course of business, as the Department did not inquire into how often the hotel rooms were used and because it was clear that the housing arrangement was subsidiary to the taxpayer's main line of business, which was providing training facilities. We disagree that Ruling 430–00–4 provides such a gloss.

{48} Once again, the ruling does not address or even mention the phrase "sale in the ordinary course of business." As with Ruling 405–04–2, we can therefore only assume that the question of whether the transaction was in the taxpayer's ordinary course of business was not an issue that the taxpayer requested a ruling on or that it was an issue agreed on by the Department and the taxpayer. Additionally, we believe that the central issue in the ruling was whether the leasing of hotel rooms is actually considered a sale of tangible personal property. We therefore do not believe that this ruling demonstrates that the Department had a longstanding policy with respect to the construction of the phrase "sale in the ordinary course of business."

{49} PNM next cites to Ruling 405–97–1 (1997) in support of its argument. In Ruling 405–97–1, a contractor entered into an agreement with an agent for two municipalities to design and build facilities funded by industrial revenue bonds. The contractor asked the Department for a ruling on whether it could issue NTTCs for the purchase of various types of equipment, furnishings, and other tangible personal property that would be resold to the agent for the municipalities as part of the construction projects. The Department stated that the contractor could issue NTTCs for those items of tangible personal property that would not be incorporated into the construction project as construc-

tion materials. *See* 3.2.1.11(J)(1) NMAC (2003) ("The term 'construction materials' means tangible personal property which is intended to become an ingredient or component part of a construction project.").

{50} PNM argues that this ruling again demonstrates that the Department does not analyze a taxpayer's past business activities to determine if a sale is in the ordinary course of business. Instead, PNM contends that this ruling demonstrates that the Department determines whether a sale is in the ordinary course of business by looking at any applicable contract provisions, as well as the taxpayer's present activities. We do not believe that the Department's conclusion that the contractor could issue NTTCs in connection with its purchase and resale of tangible personal property supports PNM's argument in the case at bar.

{51} Based on the various types of equipment and furnishings listed in the ruling, it is apparent that such items were actually being used within the constructed facilities. Thus, the central issue in the ruling was whether those items constituted construction materials. For example, although the Department stated that NTTCs could be issued for office, shop, and kitchen equipment, the Department also concluded NTTCs could not be issued for communication, security, and electronic equipment because such items are actually incorporated into the construction project and are therefore construction materials. Moreover, we again observe that this ruling does not mention the phrase "ordinary course of business," thus leading us to conclude that the question of whether such sales were in the ordinary course of business was not an issue on which the Department's opinion hinged. Just as cases are not authority for propositions not considered, *see Fernandez v. Farmers Ins. Co. of Ariz.*, 115 N.M. 622, 627, 857 P.2d 22, 27 (1993), we do not believe that Department rulings would be entitled to any different effect.

{52} Conversely, Department Ruling 401–99–4 (1999), which is not cited by either party, does mention the phrase "ordinary course of business." In this ruling, a company engaged in the business of selling computer systems asked the Department whether it

could accept NTTCs from a particular buyer. The Department concluded that the company could accept NTTCs, provided certain requirements were met. First, the NTTC must be properly executed by the buyer. Second, the buyer must sell the computer system in the ordinary course of its business. Thus, "[i]f [the buyer's] sale of the computer system to the leasing company is an isolated transaction and [the buyer] is not regularly engaged in the business of selling computer systems, [the company's] receipts are not deductible under Section 7–9–47." Ruling 401–99–4. This ruling makes it clear that in order to properly claim a deduction under Section 7–9–47, the buyer of the tangible personal property must actually sell the property in the ordinary course of its business and that the ordinary course of a buyer's business is one that is regularly engaged in by the business.

{53} We are therefore not persuaded that the Department rulings cited by PNM support its claim of a longstanding administrative policy with respect to the phrase "ordinary course of business." As such, the doctrine of administrative gloss is not applicable to the case at bar.

**CONCLUSION**

{54} For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the Department.

{55} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

RODERICK T. KENNEDY, Judge (concurring in part and dissenting in part).

KENNEDY, Judge (concurring in part and dissenting in part).

{56} PNM owns generating plants in the course of its sale of electricity on wholesale and retail markets. Since the only question is "what is activity conducted in the ordinary course of business," I must depart from the majority's excluding this bit of business for no reason but that PNM has never done this sort of deal before. Therefore, I respectfully dissent on this issue.

{57} I believe the *Champion/Tipperary/Kewanee* cases leave room for businesses to include new entrepreneurial avenues and innovation in their ordinary course of business. Indeed, the present case arose from PNM responding to a changing regulatory environment. Change and adaptation are inherent components of the ordinary course of business. Looking at any of the three views in *Champion:* routine practice of engaging in collateral business for profit (Sutin, J.); the nature of the transaction viewed in context with business practice (Wood, C.J.); or the independence of the new enterprise from a unitary view of business practice (Lopez, J.), there is room for PNM to expand its generating capacity as a matter of "ordinary course," even though its business model for this project differs from, say, their four corners or Palo Verde partnerships. *Tipperary* is in accord with this view. Excluding "new" from "ordinary" is a view of business practice with which I cannot agree. I concur as to the other issues.